# Wheeling.

ADAM CRAWFORD *et al.* *vs.* ABRAHAM CARPER *et al.*

January Term, 1870.

A case held to come within the provisions of the 1st section of chapter 118, of the Code of Virginia, 1860, by reason of fraud, in the suffering and obtaining a judgment.

This cause arose in Randolph county. The summons was issued returnable to August rules, 1865. The complainants were Adam Crawford, Lorenzo D. White, Rebecca Ward, administratrix of Levi D. Ward, Hoy McLean, Francis M. White, and John Scott. The defendants were Adonijah B. Ward, Abraham Carper, Nester Harding, and Matthew L. Ward. The last two defendants were only assignees of judgments, or securities for A. B. Ward.

. The bill alleged that on the 16th day of April, 1861, Adonijah B. Ward was indebted to Crawford, surviving partner, &c., in the sum of 574 dollars and 60 cents, with interest thereon from October 25th, 1858, and in the further sum of 67 dollars and 51 cents, with interest thereon from November 28th, 1860, and in the further sum of 115 dollars and 93 cents, with interest thereon from August 22d, 1855, and 2 dollars and 8 cents costs, subject to a credit of 30 dollars, paid May 27th, 1856; to White in the sum of 400 dollars, with interest thereon from January 18th, 1859, subject to a credit of 30 dollars, paid April 15th, 1861; to Ward in the sum of 230 dollars, with interest thereon from December 7th, 1858, subject to a credit of 6 dollars, paid April 27th, 1861; to Scott in the sum of 360 dollars, with interest thereon from November 7th, 1859; to Rebecca Ward, ad-

ministratrix, with Hoy McLean as his security, in the sum of 1100 dollars, with interest thereon from November 1st, 1861, *which said debt was contracted* March 2, 1861; and to other creditors in various other sums of money. And Adonijah B. Ward, being so indebted on the 16th day of April, 1861, confessed, in the clerk's office of the circuit court of Randolph county, a judgment in favor of Abraham Carper, his father-in-law, for the sum of 2,855 dollars, with interest on 335 dollars, part thereof, from April 1st, 1838; interest on 1,400 dollars, another part thereof, from May 1st, 1844; and interest on 1,120 dollars, the residue thereof, from April 1st, 1848, and 4 dollars and 95 cents costs.

No bonds or other memorandums in writing were executed by Ward, or book account kept by Carper, of the several items making the aggregate sum for which said judgment was confessed. That Carper was not indebted during the period aforesaid; had three children, was worth about 30,000 dollars, and was, at all times, boasting of his liberality to his children, and especially of his munificence to his daughter, the wife of Ward.

At the time of the confession of the judgment, Ward was the owner in fee of several tracts of land in the county of Randolph, containing in all 1,066 acres, and some "out lands" with doubtful title and of little or no value.

In the month of June, 1865, Carper filed his bill in the circuit court of the county of Randolph, to enforce the lien of his judgment on the lands of Ward; and the appellants filed their bill, alleging, among other things, that the judgment confessed by Ward, was voluntary and was *suffered* by Ward and *obtained* by Carper, with intent to delay, hinder, and defraud the creditors of Ward, of and from the collection of their debts, and was therefore void as to them.

And the appellants, having therefore instituted proceedings at law to obtain judgments on their respective debts against Ward, asked that judgments, when obtained, might be considered on the hearing of their bill; that their judgments should be adjudged to have priority over the judgment

of Carper, and that the lands of Ward might be sold in satisfaction thereof.

Ward and Carper answered the bill. Each denied all fraud and collusion in the confession of the judgment of Carper, but both disclosed that the judgment was founded on a single bill executed to Carper by Ward, on the day before the confession thereof, and that the single bill was so executed in consideration of items of an unkept account for money and property advanced by Carper, the father-in-law, with no price fixed, or time for its payment, and commencing with the date of the marriage of Ward with the daughter of Carper, running through a period of upwards of ten years, and ending on the 1st day of April, 1848, thirteen years and fifteen days before the execution of the single bill. Each and every item of the account had been barred by the statute of limitations more than eight years before the date of the execution of the single bill.

Proof was taken and filed in the cause by complainants and defendants. In the meantime Ward died intestate, and both causes were revived against his administrator and heirs.

At the May term, 1867, of the circuit court, both of the causes came on to be heard together, and the court pronounced its decree, dismissing so much of the appellants' bill as sought to impeach the judgment of Carper for fraud; and the causes were then referred to a commissioner for a settlement of the administration accounts and report of creditors and their priorities, and other matters. The commissioner made his report; and in his report gave the judgment of Carper priority in the order of payment over each and all of the judgments of the appellants. White and another creditor excepted to the report, upon the ground that such priority had been given to the judgment of Carper while the proofs in the causes before the commissioner showed beyond question that every item of the account upon which it was claimed the judgment had been confessed was, at the time of the confession thereof, barred by

the statute of limitations. The court does not appear to have passed upon the exception; and at its May term, 1868, pronounced its further decree confirming the report of the commissioner, directing a sale of the lands, and the order of the distribution of the proceeds among the creditors of the estate of Ward, giving to the judgment of Carper priority over the judgments of the appellants. The lands were sold, and the children and heirs at law of Ward became the purchasers of the 1,066 acres at the price of 4,700 dollars, and from this sum the dower interest of the widow of Ward was to be deducted; and by another decree of the court, pronounced at its November term, 1868, the sales were confirmed. The commissioner reported no personal assets; and at the sale, under the said decree, the entire real estate of Ward brought only the sum of 4,862 dollars, unencumbered by the dower·of the widow, she having elected to take her interest in money. At the time of the report of the commissioner, the judgment of Carper, confessed by Ward, principal and interest, amounted to the sum of 6,728 dollars and 43 cents.

There were a great many depositions taken in the cause, on the question of fraud. The testimony of eighteen or twenty witnesses was in effect and substance, that Carper had stated in conversations held at different periods prior to 1861, that he had given from three to five thousand dollars to his son-in-law Ward, and had given him all he intended to, and that he might now shift for himself. This amount appears to have been in cattle and bonds, and the gifts were all made prior to 1848. It was proven also for the complainants, that Carper had said that he wanted to secure the property, a certain mountain farm, for the use of Ward's heirs. The statements of Ward were proven, that he had not received value for the property, and he desired to keep his property for his family, and that was the cause of his confessing the judgment to Carper; that the debts of the complainants were just, but he wanted to keep his property for his family. It was also proven for the

complainants that Carper had not said anything of the indebtedness of Ward prior to 1861, and that both he and Ward had stated that the former had given the latter between 3,000 and 4,000 dollars. The declarations of Carper were also proven that he had given his daughter, Ward's wife, from 4,000 to 6,000 dollars, and that he boasted that he had done more for his daughter than any man in the neighborhood. That Ward, in speaking of his debts, did not mention any debt due to Carper; that in 1861, after the confession of the judgment, in speaking of that matter, said he had done some things that he did not like to do, that he was in trouble, and did things he did not like, to get along. That Carper stated he had given Ward a good lot of cattle when he went on the mountain farm, in 1847, that he wanted to give him a good start.

For the defendants it was proven by the wife of Ward, that the money furnished by the father-in-law, Carper, to purchase the mountain farm, was to be repaid by Ward, and the cattle were to be paid for by Ward; it was also further proven, by defendant Ward, that his first debt to Carper was for cattle and horses in 1835; his second debt for 1400 dollars, for Coyner land, and horses and cattle, in 1844, 1250 dollars of which was for the land, which in 1847, was turned by Carper into the mountain farm; the third debt was for 1120 dollars, for cattle and horses in 1848. That the mountain farm was worth, in 1861, from six to eight thousand dollars. Also by Burgess Carper, a son of defendant Carper, that Ward acknowledged the debt of Carper to be a just one, on a settlement had in 1861. That the understanding between Ward and Carper was, that if Ward could not raise the money, to wit: a certain 1,100 dollars that he had given him at one time, that Ward was to make him a deed for the mountain land, and that land was to be conveyed to Ward's children at the death of Carper; and that Ward stated he had received large amounts of money and property from Carper over and above the debt, which Carper had made no charge for.

The other depositions taken by the defendants were of a general nature, upon other branches of the case, but did not bear so directly upon the question of fraud, and intent to hinder and delay other creditors of Ward.

The mountain farm consisted of 1.066 acres of land, which defendant, Ward, claimed to be worth from six to eight thousand dollars, as before stated, but which sold for 4,700 dollars, as also before stated. The out lands claimed to be worth several thousand dollars, by Ward, sold for about 200 dollars in all.

The following errors were assigned:

"That said circuit court dismissed so much of your petitioners' bill as sought to impeach the said judgment confessed by the said Ward, in favor of said Carper, because of fraud.

"That the said court disregarded the exceptions of your petitioners to the report of the said commissioner, and interlocutorily decreed that said judgment in favor of the said Carper should be satisfied in preference to the judgments in favor of your petitioners.

"That the said court, after the allegations of your petitioners had been demonstrated, and the pretences of the said Carper and Ward as to the value of the property of the latter had been refuted by the result of the sale thereof, finally decreed that the money arising from the said sale, after satisfying the demand of the widow for her dower, should be applied to the satisfaction of the said judgment of said Carper, and not to those of your petitioners."

Hon. Thomas W. Harrison, judge of the circuit court of Randolph, presided on the hearing of the cause.

*Lee* and *Lewis* and *Hoffman* for the appellants.

The facts involved in this controversy, through much obscurity and careful effort at concealment and perversion, appear to be these:

After the marriage of Ward with the daughter of Carper,

—perhaps at more than one time from about 1835 to about 1844—Carper—a rich man in his county—gave Ward some cattle and horses.

In 1843 or 1844, Levi Ward—the father of A. B. Ward, the party just mentioned—in concert with Carper—purchased "the Coyner land" at 2000 dollars, with some sort of purpose to let A. B. Ward, or him and his wife and children, have it or use it—Carper furnishing a bond on Parsons for 1000 dollars, and Levi Ward paying the purchase money out of his own means and the proceeds of this bond, and Levi Ward gave to Carper a title bond for half the land. Soon afterwards the parties or some of them became dissatisfied.    A. B. Ward—perhaps with the assent of Levi Ward and Carper—sold or negotiated a sale of the land to Hinkle at the price of 3000 dollars, for which he took bonds amounting to 1250 dollars, payable to Levi Ward, and for the residue, bonds perhaps payable to himself.    Levi Ward transferred the bonds for 1250 dollars to Carper, and A. B. Ward retained the others.    Hinkle paid the amount to Carper, and he relinquished to Hinkle whatever right or claim he had under the title bond.    Carper perhaps claimed that he should have something out of the other bonds, while A. B. Ward claimed that the enhanced value for which the land was sold, was due to improvements made by him, and that he should have the residue of the excess of price, and Carper in some way yielded it to him—Ward in his last statement on the subject says, gave it to him.    In 1847, or about that time, A. B. Ward turned over to Levi Ward the residue of Hinkle's bonds, and perhaps paid him something more, amounting to 2000 dollars, and Levi Ward conveyed to A. B. Ward "the Cheat mountain land."    The deed was made in 1848.    As Carper had indicated his purpose to advance his daughter—had probably promised to do so—but had not done it in this transaction, while Levi Ward had substantially given A. B. Ward the Cheat mountain land, by which Carper's daughter would be benefited—at least to the extent of her right of dower—Carper, about the same time, in

1848, advanced to Ward, the husband of his daughter, a lot of cattle and some horses.

Afterwards, Ward having land and personal property in his possession, for which—at least so far as any one heard—he was in no way indebted—Carper habitually speaking of the amount of property and money he had advanced or given to Ward, but not mentioning to his nearest neighbors or most intimate friends—as far as we learn—that he had any demand whatever against Ward on account of the property he had let him have,—Ward became indebted to Crawford and others.

At some time Ward and Carper conceived and determined that Ward's property should be secured to himself or his wife and children, rather than appropriated to the payment of his creditors. Accordingly, having a grazing place suitable for the pasturage of cattle during the summer, in March, 1861, he bought cattle of his brother, and induced McLean to become his surety for the price, and got possession of the cattle; and in April—the next month—an estimate was made of the pretended value of property from time to time advanced by Carper to Ward or his wife, including 1250 dollars on account of the bonds in fact paid by Hinkle to Carper, then, or at any rate afterwards, pretended to have been paid on account of the Cheat mountain land—the first of these advancements claimed to have been made twenty-six years, and the last thirteen years before; an amount was fixed; Ward and Carper agreed verbally that if Ward could not raise the money when Carper called for it, the Cheat mountain land should be conveyed to Carper, and at his death to Ward's children; Ward executed his bond and the next day confessed a judgment to Carper for a large sum of money with much interest, now alleged to have been the aggregate of these items. On the first day of May, a few days afterwards, Ward sold, or pretended to sell, the cattle bought of his brother, for which McLean is surety, to Carper or his son with his approbation, he co-operating in receiving and disposing of them—and, as the son testifies,

Ward received and enjoyed the price, while the cattle were drvien to his Cheat mountain farm to fatten during the summer. Afterwards Carper instituted his suit for the purpose, and had the Cheat mountain farm and all the other property of Ward sold to satisfy his wife's dower and the amount of the judgment confessed, when it was purchased by Ward's son and the husbands of his daughters— grand son and grand daughters of Carper;—and Ward's creditors and surety are left only their experience for payment and indemnity.

As the consideration (if there was any) for which the bond was executed and judgment confessed by Ward to Carper was peculiarly within their knowledge—a matter to which the other creditors and surety were strangers—the result of transactions between near relatives tending to the destruction of the interests of these parties—which according to the decision of the circuit court has actually had that effect —and the proof of consideration is in its nature affirmative; the necessity was with Carper and Ward to prove it.  1 Greenl. Ev., 78, 79; 2 Lom. Dig., (New Ed.), 262; citing *Clapp* v. *Tirrell*, 20 Pick., 247; *Rogers* v. *Hall*, 4 Watts, 359; *Kimball* v. *Fenner*, 12 N. H., 248; 2 Tuck. Com., (Third ed.,) *426, note; *Lewis and others* v. *Caperton and others*, 8 Gratt., 148; *Brackenridge* v. *Auld, &c.*, 1 Rob. R., 148.   *   *   *

Even when the allegations of the bill are affirmative in their nature, and must be proved by the plaintiff who makes them, when the answer is not clear and positive, it is not equal to the testimony of a witness, and the issue may be sustained on the part of the plaintiff by the testimony of a single witness. 3 Greenl. Ev., 289; *Slater* v. *Maxwell*, 6 Wallace, 268—sec. 275, and cases cited. When the defendant must prove facts necessary to his defence, and his answer is uncertain and evasive, it does not prove the fact, even if uncontradicted. It is not evidence of what it does not distinctly allege. The rule that because a party had to go into a court of equity for redress, his adversary should be a witness against him—especially in cases of fraud, when

the very fact alleged and in issue implied such turpitude as to discredit the party to it—was entirely technical, and might be met with another technicality.   It was most unreasonable, and fraught with great hardship and much mischief, and has been wisely and properly abolished in the late revisal.   *   *   *   *   *

If the value of the items of property advanced by Carper to Ward constituted debts due by the latter to the former, they were barred by lapse of time—before the debts due to Crawford and others were contracted—long before the bond and judgment were given and confessed by Ward to Carper.   They were not at that time a consideration deemed valuable in law.

Rights and remedies are co-relative.   Where there is a right there is a remedy.   Where there is no legal remedy there is no legal right.   *Bronson* v. *Kinzie*, 1 Howard, 316; *McCracken* v. *Hayward*, 2 How., 611.   A debt barred under the statute of limitations is a moral, not a valuable consideration.   *Court* v. *Cross*, 3 Bing., 329;   11 Eng. Com. Law Rep., 126; *Irving* v. *Vetch*, 3 M. & W., 106; *Butcher* v. *Hixon*, 4 Leigh, 519—see 522; *Sutton* v. *Burris*, 9 Leigh, 381—see 385; *Brown* v. *Joiner*, 1 Richardson, 210; 1 Pars. on Contracts, (Edition 1866), p. 434, and authorities cited in note *u*. Story on Contracts, § 466.   We have the highest authority, as early as *Twine's case*, that "equity requires that the deed that defeats others shall be made of as high a consideration as the things are that are so defeated thereby."   44 Eliz. in Com. Stel. fo., 80.   And such is yet the law.   Analagous principles are held in numerous cases.   *Roosvelt* v. *Mark*, 6 Johns. Ch. Rep., 290.

The bar of the debt saps from the original contract its value in law, and intrinsically vitiates and avoids the bond or judgment for the amount.   The effect of this is asserted in the allegation of want of valuable consideration or the fraud, and need not to have been specially pleaded at law. If this were otherwise, would not the failure of the debtor to plead the lapse of time for the protection of his creditors

who had not the opportunity to do so, be itself a fraud, or an element of fraud against them? Or, they not having had an opportunity to do so at law, while they are vitally interested in the consequences, may they not avail themselves of it in a court of equity whenever its effect is in question? The statute of limitations is one of repose, intended to afford security against stale demands, when the true state of the transaction cannot be readily, if at all, ascertained and explained, and is on this account wise and beneficial. If it is important to protect a party to a debt alleged to remain due, how much more important is it to protect a stranger to a stale demand, who knows nothing of its creation or payment, but is nevertheless to be ruined by its enforcement.

If the debts were contracted at the times pretended, they were paid long before the bond was given and judgment confessed.

Statutes of limitation are founded on the general presumption that debts and demands supported by evidence which alone would prove their creation, have been paid or discharged. *E converso*, when the lapse of time, if pleaded, would bar the debt or demand, but it was not pleaded because the party really interested had no opportunity to do so, will not the debt or demand be presumed to have been paid or discharged?

When there has been adverse possession of land or personal property long enough to bar an action, it need not be pleaded, but may be relied on under a general issue. The bar of the action confers the title—upon which an action may be maintained. *Taylor* vs. *Burnsides*, 1 Grattan, 165; *Layne* vs. *Norris' adm'r*, 16 Gratt., 236. When the limitation of actions for the recovery of lands was twenty years, after a possession for that length of time, by analogy, a conveyance would be presumed. The rule has long been established that after twenty years a bond will be legally presumed to have been paid, and by analogy the lapse of that time has been made by statute a bar to the recovery. When the time necessary to bar a writ of right was reduced

to fourteen years, it was held that after the expiration of that time a power of attorney under seal would be presumed to support a deed for the conveyance of land. When on the general principle of presumption of payment the statute provides that the lapse of five years shall bar an action for a debt contracted by a note signed by the party sought to be charged, as well as one by a verbal contract, what time will create the presumption of payment of a debt, of which no note or charge or memorandum was made, in favor of persons who, though deeply interested, are strangers to the parties and have no knowledge of the creation or payment of the pretended debt, or opportunity to plead the bar?

We insist not only that Ward and Carper have utterly failed to prove the indebtedness of the former to the latter for the different items stated, at the time of the execution of the bond and confession of the judgment by the former to the latter, but that Crawford and the other creditors and surety have disproved such indebtedness.

Therefore, under section 2 of chapter 118 of the Code of Virginia, the bond and judgment were absolutely void as to the creditors whose debts were contracted before the execution and confession of the bond and judgment. Under this section no question of notice arises.

It will—it is supposed—not be urged that all the items for which the bond was executed were debts contracted before and remaining in force at the time of its execution. * * * Though a part of the consideration of the bond had been a valid debt, contracted before and subsisting at the time of its execution, yet if any part was not, the bond and judgment were, on that account, fraudulent in fact and void *in toto. Reeves* v. *Garland,* 4 Ran., 282; *Lewis* v. *Caperton's ex.,* 8 Gratt., 148; and numerous other cases.

But, if the whole pretended consideration of the bond and judgment had existed and been valuable in law, the transaction was nevertheless intended to delay, hinder and defraud creditors, and therefore void as to them. * * *

Men are presumed to intend what is the natural consequence of their conduct.  *  *  *

This case is in principle similar to the large class of cases in which a party places or leaves property in possession of another and thereby gives him credit, and yet claims the title to or some right in the property, inconsistent with the apparent right of the possessor. If, when the bond was given by Ward to Carper, they had pretended that the latter had reserved such title or right to or in the property, the reservation would, without other indication of fraud, by the letter of the statute, have been held void as to creditors. Ward and Carper were—it is supposed—advised of this, and therefore, then or afterwards, asserted the secret indebtedness for the property—which is equally inconsistent with the conduct of both parties for a series of many years. Would the former be more mischievous than the latter?

The common law is the basis of the statutory provisions relative to frauds against creditors. These are intended to embody the principles of most general application.  *Hamilton* v. *Russel*, 1 Cranch, 316; *Fitzhugh* v. *Anderson*, 2 H. & M., 302; *Hutchison and others* v. *Kelly,* 1 Rob. R., 123–128; 13 Howard, 92–98. But the principles of the law often apply to and control transactions not at all within the letter of the statute.

Statutes are construed liberally for the suppression of fraud. 2 Lom. Di., 324—late ed., 419, and cases cited.

This case is clearly within the spirit of section 3 of the chapter already mentioned.

But—waiving this proposition as one of absolute law—the facts just mentioned certainly constitute a potent element in the evidence of the intent to delay, hinder or defraud creditors—an intent to do either of which improperly is equally fatal to the bond and judgment.

Fraud may be presumed from the relation of the parties or other circumstances—against the oaths of parties. *Bates* v. *Graves*, 2 Vez., jr., 294; Bac. Ab. Fraud, B. 288–9; *Odenheimer* v. *Houson*, 4 McL., 437; *United States* v. *Samperyac*,

Hemp., 118; *Whitemore* v. *Murdock*, 3 W. & M., 380; *Bulkley* v. *Buffington*, 5 McL., 457; *Walcott* v. *Alny*, 6 McL., 23; *Dr. Wolf* v. *Harris*, 4 Mason, 515; *Castle* v. *Bullard*, 23 How., 172.

When a debtor charges his property in favor of a near relative, to the postponement of other creditors, there is a strong presumption that it is fraudulent as to creditors. Bac. Ab. Fraud, C., (ed. 1844, vol. 4, p. 404), and cases there cited.

The agreement or understanding, however, between Ward and Carper, about and at the time of the execution of the bond and confession of the judgment, that the land of Ward, to be obtained by Carper in satisfaction of the judgment, should be settled by him on Ward's children, is conclusive as to the fraud. *Wright* v. *Hancock*, 3 Mun., 52; *Bullock* v. *Wyatts*, 4 Mun., 450; *Garland* v. *Reeves*, 4 Ran., 298; and numerous other cases.

This is equally fatal, whether there was a full consideration deemed valuable in law for the bond and judgment, or not. If, with the proper motive to secure a just debt, be coupled the improper one to secure a part of the property of the debtor for the benefit of himself or his family, or other objects of his care, rather than to his other creditors, the whole transaction is vitiated. "*Quod alias justum et bonum est, si per fraudem petatur, malum et injustum efficitur.*" 4 Ran., 301.

"It is not the consideration but the intent with which a conveyance is made that makes it good or bad against creditors. However valuable the consideration, if the conveyance be designed to delay, hinder or defeat creditors, it is void." *Hunter* v. *Waite*, 3 Grat., 26–33.

"The intent with which an act is done may be a conclusion of law from certain facts, against which conclusion all other evidence is unavailing." Same case and page.

Carper participated in the fraud. He certainly had notice of Ward's intent. This appears throughout the history of the transaction.

But notice to Carper of Ward's intent is not necessary to the invalidity of the bond and judgment.

Such notice would be necessary to avoid a purchase for

valuable consideration. But a judgment confers not an estate in, but a mere right to satisfaction out of land. In this respect a purchase and a judgment are widely different. *Brown* v. *Pierce*, 7 Wallace, 205, and cases cited.

Accordingly, section 1 of the Code, already mentioned, makes notice important when there is a purchase for a valuable consideration, but not when there is only a bond or judgment. The same distinction prevails in sec. 8 of chapter 186 of the Code of Virginia, relative to judgments not docketed.

In any aspect, then, the bond given and judgment suffered by Ward in favor of Carper, with intent to delay, hinder or defraud Crawford and other creditors, and McLean the surety, is, under section 1 of the chapter of the Code first mentioned, unquestionably void as to them.

If there were any question as to this, there were certainly such circumstances and other evidence, that the court should have directed an issue to try the fact. *Marshall* v. *Thompson*, 2 Mun., 212; *Bullock* v. *Watts' adm'r*, 4 Mun., 450; *Nelson's adm'r* v. *Armstrong*, 5 Grattan, 354; *Wise* v. *Lamb*, 9 Grat., 294–303.

*Boggess* and *G. D. Camden* for the appellees.

BROWN, *President.*

Abraham Carper being a man of considerable estate, and unembarrassed, whose daughter was married to one Adonijah B. Ward, advanced to his son-in-law money and property at different times, with the understanding that the son-in-law should pay for the same if required. That no entry of account was ever made and kept, or note taken for the same, though extending from April 1st, 1838, to April 1st, 1848. That subsequently the son-in-law, Ward, becoming largely indebted and insolvent, the father-in-law and son-in-law had a settlement on the 16th of April, 1861, and thereupon the son-in-law executed his note to his father-in-law for the amount he thus acknowledged to be due and owing, viz: for 2,855 dollars, with interest on 335 dollars

part thereof, from April 1st, 1838, and on 1,400 dollars, other part thereof, from May 1st, 1844, and on 1.120 dollars, residue thereof, from April 1st, 1848, and then forthwith confessed judgment on said note in favor of his father-in-law, with the view and for the purpose manifestly in both parties to secure to the father-in-law the first lien on the son-in-law's land, which was subsequently sold under the decree of the court in this case, and did not bring enough to discharge said judgment. These debts thus acknowledged, and for which the said note was given and judgment confessed, (if they ever as such debts existed, which was much controverted in the case, but which question I do not think it necessary to consider in the view I take of the case) were all barred by the statute of limitations. And while it was all very right, if they were just and real, that they should be acknowledged and paid by the debtor as between the parties, yet still, the important question remains whether, under the circumstances of the case, it could be so done, as above stated, so as to intercept the other *bona fide* creditors whose debts were not so barred. And I am free to say I think it could not, because it comes clearly within the first section of chapter 118 Code of 1860, and is just such a case as it was the intention of the statute to prohibit.

It is unnecessary, therefore, to notice any of the other questions raised in the argument. The circuit court erred in dismissing the bill so far as it alleged fraud as to the creditors in the transaction. It further erred in appropriating the proceeds of the sale of the land of the debtor Ward to the said judgment of his father-in-law Carper, to the exclusion of the creditors.

I think, therefore, that the said decrees of the circuit court ought to be reversed, and the cause remanded to the circuit court of Randolph county, to be further proceeded with in conformity to the views above stated.

The other judges concurred.

DECREE REVERSED.