Chief justice Robertson
delivered the Opinion of the Court.
George Turner, having been recognized to appear in the Garrard County Court, on a charge of being the father of a bastard child borne- by Sally Hill, appeared in discharge of his recognizance, and—notwithstanding the opposition of said Sally and of the attorney for the county, was discharged by the Court, upon proof of the following writing:—-
“For and in consideration of the sum of one hundred “ dollars, to me this day paid by one horse beast at for- “ ty, and six ten dollar notes to be paid in six annual in- *512 « sUllments, I hereby discharge George Turner from twb d prosecutions in bastardy set on foot against him bf me, in the Garrard County Court, for the use and ben^ a @fit 0f my (W0 infant children Mary Jane and Martha “ Ann Hill—and I further agree, never to commence any “ further prosecution against him, for their benefit, nor “ will I permit any person to do sd ill my name; and I “hereby direct the attorney fdr the county; and the d Court, to dismiss the prosecutions pending in the- Coun- “ ty Court aforesaid, against him.
The mother of two or morebaswritin^^Jaíed •/Zttg. 21, :35,dis fromStwo prosed eutions set on him (as tlrTfabeTefit ofh fant children”— naming two, &, directing the dismissal of the prosecutionspe?» ¿¿mg in the county court: held'. that that writing could noq apply to, or authorize the dismissal of, a warrant dated Mug. 27-, against the same man, charged as the "father of an, unnamed chitó.
*512 “ Given from under my hand this 21 st of August, 1835.
“ Sally Hill, (l. s.)
“Test—B. F. Duncan.”
The subscribing witness also swore, that the horse described in the writing was worth not more than five dollars. Another witness testified that it was worth thirty dollars. And another proved that, not long after the date of the writing, he saw the six ten dollar notes in the possession of the obligor, who said he had found them, and requested him to deliver them to Sally Hill, which he accordingly attempted; but she refused to re‘ ceive them;
Waiving all consideration of the question whether it it should be clearly understood, that the alleged compromise Was completely executed by the delivery of the horse and the promissory notes, or was fair and equal, or, in other respects, such as might, in an ordinary case of mere private right, be a good accord and satisfaction, or a virtual release—there are still two objections to the decision by the County Court.
First. The writing purports to have been executed on the 21st of August, 1835, as evidence of a compro^ m^se °f íwo cases bastal’dy then pending; and the warrant in this case, was not issued until the 27th of August, 1835, and charges the defendant with being the father of only one unnamed bastard child. There is not a sufficient con'espondence between this case, there-^ore’ an(^ ^'10se described in the written memorial of the alleged compromise, to identify the child mentioned in warrant with either of those respecting whom the . i , ° , compromise was made. And consequently, as there is *513 no extraneous proof of identity, does not appear that the subject of this case was embraced by the contract.
The statutory -proceeding in a pase Of ba'stard'y-, is not a criminal or penal prosecution; but is in the nature of a civil proceeding, aná 'so .far for the mother’s benefit that she may recover costs.
The mother is not hound to institute any judicial proceeding. She may agree with thefather for contribution towards'the child’s support, &theagreement will be binding on him* But—
No agreement be tween the mother and putative father, will bar a proceeding under the statute* to compel him to give security for thc suppbrt of tho child.
The act of ’95, as amended, requires a bond to be given, by the father of a bastard child, With security, to the commomeealth, for the payment, from to time, of such sums as maybe deemed sufficient to support the child—which are payable, not to the mother as such, but to the guardian; the object and effect of which bond, is, to provide for the support of the child, assist the mother, and secure the public from being charged with a pauper; and as the mother is not the only party to be benefitted by the proceeding—she connot dismiss it when it is once commenced. The only way in which she can stop it, is by failing to attend and give testimony.
Second. But no agreement which the mother and^putative father could have made between themselves in the "country; would be sufficient to bar this proceeding'.
It has been, more than once, decided by this Court, that a warrant, at the instance of a mother, for compelling the father of their illegitimate child to contribute to its maintenance, is not a criminal or penal prosecution, but is m the nature of a civil proceeding for enforcing an obligation both natural and civil; and that it is so far for the mother’s benefit, that, if she succeed, she may have a judgment for costs; and also, that she is neither under any civil of moral obligation to institute such a proceeding, nor is guilty of any breach of public Or social duty by agreeing with the father for a conventional contribution, in lieu of the statutory remedy for coercing him. And, as a deduction from these doctrines, it was decided in Bergen vs. Straughn (7 J. J. Mar. 583,) that such a voluntary agreement would not be necessarily immoral, illegal, or invalid, as between the parties, and might therefore be enforced against the father of the bastard-.
But it has never been said by this Court, or by any other authoritative tribunal, so far as we are informed, that any such contract between the father and mother of a bastard child would bar a legal proceeding tinder the statute of 1795, concerning bastardy. And, in the case just cited, that point was expressly, and rather significantly-, reserved-. Indeed, no principle yet settled, is inconsistent with the conclusion, that such a contract should not operate as a bar to such a proceeding*
A statute of 18f/t Elizabeth, c. 3, authorized two justices to require the mother or reputed father of a bas *514 tard maintain it, and to imprison a contumacious par-5 ty until security for proper maintenance should be given. Other subsequent statutes of England made various ot]ier provisions for compelling the fathers and mothers of bastards to maintain them» And by a statute of 6 Geo. II. c. 31-, any mother of a bastard child was allowed uto s wear it to any person;” and the statute authorized the overseer of the parish to proceed upon such an affidavit to apprehend the putative father, and commit him to prison, unless he should give satisfactory security for indemnifying the parish.
These legislative enactments wore evidently intended for securing three different objects: first—the welfare of helpless and destitute bastard children; second—the relief of the parishes from the burthen of supporting such persons, and, third—justice to their mothers, and the enforcement of the natural obligation of their fathers. And it is evident that our statute of 1795, prescribing the mode of proceeding in cases of bastardy, is but a reenactment of the substance of that of Geo. II. only more detailed and expansive in its provisions. The policy of each was alike threefold. And the reason why, in both, the mother is authorized to initiate the prescribed proceeding, was, not only because it might be beneficial to her personally, but also, because she alone could be presumed to know who the father of her child was, and therefore, through her intervention, justice to herself, to her child, and to the parish or county of its residence, would be the more certainly secured. The statute of 1795, as now amended, requires a bond to the Commonwealth for the maintenance of bastards by their convicted fathers; and it not only requires approved security, but makes it the duty of the County Courts, to compel the fathers of bastards to pay, periodically, as much and as long as may, in each case, be deemed necessary for their proper maintenance. And moreover it does not contemplate any payment to the mother, as mother, but intends that the whole amount adjudged against the father, shall be paid to the guardian only. These provisions are alone sufficient to show, that to compel the *515 performance of a natural duty, to secure in the most just and certain mode, maintenance and education of bastards, and to relieve the public from the necessity of contributing—as well as to do justice to unfortunate mothers—were all important objects of the statute of 1795, under which the proceeding in this case was instituted. And consequently, though the mother of a bastard child cannot be compelled to become actor, yet, whenever, at her instance, the statutory process has been commenced, the case is not hers alone, nor for her exclusive benefit, but is one in which, not only her child,t but the public also has an interest, to secure which, as well as her own rights, she is only the appointed agent for initiating the action of the law. And though, therefore, she may fail to attend and give testimony, she cannot otherwise control the case, against the will of the official attorney of the county, or that of the guardian of her child, if there be any other guardian than herself. And, of course, it would be unreasonable and inconsistent, that any agreement between hex-self and the person charged with being the father of her child, should be. admitted as a legal bar to the proceeding and an insuper._ able obstacle to the effectuation of the provident pur-, poses of a yvise and salutary law, enacted; chiefly for. the beneficent end of enforcing paternal obligation to, the most forlorn condition of infancy. Could a poor, and ignorant, and w'retched mother thus control such a proceeding, once commenced, artful and unprincipled fathers of bastard children, might unjustly elude the power of the law, and fraudulently frustrate its wholesome policy, by false and inadequate promises, unsecured, and never to be fulfilled, or," if performed, not for the children’s benefit; and thus unfeeling fathers of destitute,, infants could control a public law made to control them. This cannot be admitted to be the doctrine of the law.
Then let such men make their contracts, and perform them too. But let them also know that, if their illegitimate children are not properly maintained, the law still has power to coerce adequate contributions from^ those whose natural and legal duty it was to make them with-,.
*516 out solicitation or coercion; and that, in whatever they do or agree to do by voluntary contract, they depend altogether on the honor and fidelity and personal responsibility of those with whom they negotiate.
Such contracts, if fair, are not illegal. But they can-, not paralyse the law, if those who have a right to its protection invoke its interposition in the mode prescribed by the statute of 1795.
Wherefore,,, it is, our opinion, that the compromise relied on in the County Court, was insufficient to bar or. arrest the proceeding which had been legally commenced, and was properly pending; and the more especially, as the relator herself was in Court and opposed the discharge of Turner.
And as the order discharging him on that ground, might, if unreversed, bar any further proceeding against him, therefore, it is considered and adjudged, that the said order be and the same is hereby set aside and annulled, and the case remanded to the County Court.