# CHARLESTON.

## BILLINGSLEY *v.* CLELLAND *et al.*

Submitted June 10, 1895—Decided Nov. 23, 1895.

1. BASTARDY PROCEEDINGS—COMPROMISE—LEGAL CONSIDERA-
    TION—PUBLIC POLICY.

    A note given to a woman in compromise of a bastardy proceed-
    ing is binding and valid, and on sufficient consideration, and
    the payment thereof can not be avoided on the ground that the
    compromise of such proceeding is contrary to public policy, or
    against public morals. Nor can the innocence of the putative
    father be set up as a defense against the recovery of such note, in
    the absence of fraud on the part of the obligee in procurement
    thereof.

2. BASTARDY PROCEEDINGS—MOTHER OF BASTARD—DISCHARGE
    OF ACCUSED.

    Under the statutory provisions of this state, a bastardy proceed-
    ing can only be instituted by the mother of the child; and unless
    the county court assumes the prosecution thereof, and orders the
    suit to proceed in its name, she has the right to compromise and
    dismiss the same. Failure to regularly continue such suit from
    term to term, or require a renewal of his recognizance, operates
    as a discharge of the accused, and such proceeding can only be re-
    newed by the mother in the manner provided by law.

3. PROMISSORY NOTE—ASSIGNMENT.

    The assignment of a promissory note carries with it all the rem-
    edies of the assignor, including the right to attack a fraudulent
    conveyance.

4. HUSBAND AND WIFE—FRAUDULENT CONVEYANCE.

    A conveyance of property from husband to wife, directly
    or indirectly, with fraudulent intent towards prior or subse-
    quent creditors, will be held void as to such creditors.

W. S. MEREDITH for appellants:

I.— *The demurrer to the bill should be sustained and the bill
    dismissed.*

*Fraud is not assignable. The right to file a bill to set aside a
    legal instrument for a fraud committed upon the assignor is
    not assignable.*—5 Johns. (N. Y.) 565; 102 U. S. 154–5;
    27 A. St. R. 102; 28 A. St. R. 106–8; 88 A. D. 740; 56

A. D. 444, 447 note, 449; 2 Story Eq. Jur. § 1,040*g*; 1 A. & E. Ency. Law, 833; 70 A. D. 489; 1 You. & Coll. 481; 54 N. W. R. 168; 94 Mich. 381; 7 Mackey, 175.

II.—*Husband's voluntary settlement of property on his wife is lawful &c.*—25 W. Va. 242, 255, 256.

III.—*Assignee does not acquire the legal title to the debt, but an equitable right &c.*—13 W. Va. 718.

IV.—*Recording deeds, notice thereof.*—22 A. Rep. 146; 14 Id. 117; 45 Id. 188-90; 23 A. D. 36, 47; 55 A. D. 105; 67 A. D. 360; 22 Id. 695; 70 A. D. 192.

V.—*The consideration for the notes executed by Clelland to Morley was against public policy and in contravention of the statute.*—Code, c 80; 19 A. E. Ency. Law, 565; 2 Id. 368, &c.; Hutchinson's W. Va. Treatise, § 1,497, p. 1,062.

VI.—*The bill can not be maintained till an execution issues on the judgment, and duly returned, after the officer has held it sixty days, "showing by the return thereon that no property could be found from which such execution could be made"*—Code, c. 139, s. 7, and c. 50, s. 135.

VII.—*The woman can not dismiss the bastardy proceeding without the consent of the county court, and the county court can still prosecute the case against Thomas Clelland.*—Code, c. 80.

VIII.—*The notes having been given for the debt, default or misdoing of another, does not change the rule requiring consideration, &c.*—12 W. Va. 699.

IX.—*Cause should have been referred to a commissioner to ascertain the personal estate of the decedent, and such personal estate exhausted before directing a sale of the real estate.*—8 W. Va. 219; 10 W. Va. 748, 755; 26 W. Va. 479; 3 Id. 480; 11 Id. 146; 33 Id. 600; 31 Id. 688.

JAS. A. HAGGERTY for appellee:

*On demurrer*—Code 1891, c. 74, s. 1; 30 W. Va. 393; Code 1891, c. 99, ss. 14, 16; 1 Young & Coll. Exch. R. 481; 1 Am. & Eng. Ency. Law, 883 n. 1, 884, n. 5; 2 Barb. Chy. 596; Code 1891, c. 80, s. 3; 12 W. Va. 337; 31 Id. 441.

*As to no execution*—Code 1891, c. 133, s. 2; 19 W. Va. 78.

*As to fraudulent conveyances.*—32 W. Va. 203, 447; 37 W.

Va. 396; 2 Pom. Eq. Jur. § 973, etc.; 30 W. Va. 393; 24
Id. 730; 10 Id. 87.

*As to character of proof and what sufficient.*—10 W. Va. 321,
etc.; 17 Id. 717; 22 Id. 593; 27 Id. 206; 30 Id. 619; 35
Id. 719.

*As to constructive trust.*—2 Pom. Eq. Jur. § 981, etc.; 15
W. Va. 567.

*As to consideration of notes.*—Bish. Cont. §§ 51, 83, 119, 127,
128, etc.; 23 Gratt. 737; Lawson Rights Rem. and Pr.
Vol. 5, § 2244.

*As to referring case to Commisioner.*—27 W. Va. 206.

English, Judge:

On the second Monday in September, 1865, Fontaine
Smith, commissioner, sold, under a decree of the Circuit
Court of Marion county, a tract of land situated in said
county, containing seventy five acres and a fraction; at
which sale Zackwell Clelland became the purchaser for the
sum of one thousand one hundred and sixty two dollars
and fifty cents—paying in cash ninety five dollars and thir-
ty six cents, and executing to said commissioner his three
several bonds, with security, for three hundred and eighty
seven dollars each, bearing interest in accordance with the
terms of the decree of sale; and on the 29th day of May,
1867, said purchaser having complied with the terms of
sale, the said Fontaine Smith, commissioner, executed and
delivered a deed for said tract of land to said Zackwell
Clelland.

On the 6th day of January, 1891, Thomas Clelland, a
son of said Zackwell Clelland, who was then twenty six
years of age, was arrested upon a charge of bastardy, upon
the affidavit of Isabella Morley, which accused him of be-
ing the father of a female bastard child, of which she was
delivered on the 23d of February, 1890; and on the 6th
day of January aforesaid the said Thomas Clelland entered
into a recognizance before a justice of Monongalia county
in the penalty of three hundred dollars, with said Zackwell
Clelland as his surety, for his appearance before the circuit
court of Marion county, W. Va., on the first day of the
next term thereof.

On the 5th day of June, 1891, the said Zackwell Clelland executed and acknowledged a deed to Charles E. Clelland for said tract of land, and also executed a bill of sale of all of his personal property to said Charles E. Clelland, and on the same day the said Charles E. Clelland conveyed said real estate and personal estate to Mary E. Clelland, the wife of said Zackwell Clelland, all of which conveyances were at once placed upon the records of Marion county.

On the 8th day of June, 1891, the said Zackwell Clelland went to said Isabella Morley, and compromised said bastardy case by executing to her three notes for eighty three dollars and thirty three and one-third cents each, which she afterwards assigned to one Morgan Billingsley, who, after obtaining a judgment upon one of said notes, filed a bill in said circuit court to set aside said deeds from Zackwell Clelland to Charles E. Clelland, and from Charles E. to Mary E. Clelland, the wife of said Zackwell Clelland, as fraudulent and void.

Said Morgan Billingsley, in his bill, alleged the foregoing facts as to the manner in which title to said property was acquired by said Zackwell Clelland, and how and when the same was transferred to Mary E. Clelland, and also alleged that at the time the said Zackwell Clelland went to said Isabella Morley to induce her to compromise said bastardy case, on the 8th day of June, 1891, he represented to her that his notes would be perfectly good for the amount therein mentioned, for the reason that he was the owner of said seventy five acre-tract of land, and that, confiding in his honesty and the truth of his representations, she was induced to make said compromise, and that neither he nor the said Isabella Morley had any notice of said conveyance to said Charles E. and Mary E. Clelland; that no consideration passed for said conveyance; and that the said Charles E., the nephew of said Zackwell Clelland and Mary E., his wife, conspired with said Zackwell Clelland in making said conveyance with the intent to cheat and defraud the said Isabella Morley in making said compromise of the bastardy proceedings against Thomas Clelland, the son of said Zackwell and Mary E. Clelland.

The defendants demurred to said original bill, and the

said Zackwell Clelland having died, and the sheriff having been appointed his administrator, the plaintiff filed an amended and supplemental bill making the administrator and heirs at law defendants. Said amended bill was also demurred to, and the demurrers were overruled by the court. The defendant Mary E. Clelland answered said bills, alleging that she derived considerable personal estate from her father, amounting in the aggregate to one thousand and two hundred dollars, and that said tract of land was purchased for her at said commissioner's sale by her brother, and that the money to pay for the same was furnished by her out of her separate estate, although the deed was taken in the name of her husband, Zackwell Clelland, and that in conveying said land to her he only conveyed to her what she was entitled to; and she denied that said conveyance was made with intention to defraud any person, and put in issue all of the material allegations of the bill, and alleged that her husband, Z. M. Clelland, never owed the said Belle Morley anything, either before, at the time of, or after said notes are alleged to have been given by said Z. M. Clelland to said Belle Morley; that, if said Z. M. Clelland ever gave or executed his said notes to said Belle Morley, they were obtained by her by fraudulent representations, and are wholly without any consideration. And she charges that the said charge of bastardy, if any ever was made, brought by said Belle Morley against said Thomas Clelland, was false and fraudulent, and that said Thomas Clelland appeared to said charge and pleaded not guilty.

Thomas Clelland also answered said bill, denying that he ever authorized his father, Z. Clelland, to compromise said proceeding for him at any time, and alleging that said three notes were obtained by said Belle Morley by false and fraudulent representations; that said Belle Morley falsely, fraudulently, and corruptly charged him with being the father of a bastard child of which she claimed to have been delivered, and fraudulently induced said Zackwell Clelland to execute to her said three notes. And he alleges that said charge brought against him is false and fraudulent, and that said notes were wholly without any

consideration moving from said Belle Morley either to him or said Z. Clelland. And he further says that if the consideration for which said notes were executed as aforesaid was that the bastardy proceeding be compromised, and that the same should be prosecuted no further against him, then there has been a total failure of the consideration, as the said Belle Morley has wholly failed to have said bastardy proceeding dismissed, and the same was then pending in the circuit court of Marion county, and might be prosecuted against him either by the county court or said Belle Morley, and she has entirely failed to obtain the consent of the county court to have said bastardy proceeding dismissed.

Depositions were taken by both plaintiff and defendant. The defendant Thomas Clelland, in his deposition, states that he never authorized his father to compromise said bastardy proceeding with said Belle Morley, and to execute to her his three notes for eighty three dollars and thirty three and one-third cents each, for he did not owe her anything; that he never talked to her about compromising said case, and when asked, "Did you ever have carnal connection with Belle Morley, the girl who charged you with being the father of her bastard child?" replied, "No, sir; I never did." And this is the only testimony upon this point, as the said Belle Morley was not put upon the stand to contradict him; and, if this testimony of Thomas Clelland is to be credited, the said Belle Morley perpetrated a fraud in instituting said proceedings, and could not recover upon said notes if they had never been assigned by her. Again, there is another reason why she could not recover upon said notes, and that is because the evidence shows that she promised to do what she had no power to carry out, as a consideration therefor, to wit, to dismiss said prosecution and release said Thomas Clelland from all claims on account of said bastardy proceeding, which she never has done, and has no power to do, without the consent of the county court. The testimony of the clerk of the circuit court showing that there never had been but one order made in said bastardy case, and that was an order of continuance, the case then, is still pending in the circuit court

of Marion county, and, although pending in the name of Isabella Morley, may be prosecuted in the name of the county court, if the court so order; and if the defendant should appear and plead, as he was bound to do by his recognizance, the case would be heard, and if he should be found guilty the judgment would be, not that he pay to the woman, but to the county court, for the maintenance of the child, such sums as it may deem proper for each year, until such time as the court may appoint, unless it sooner die, and it may order the father to give bond in such sum as it may deem sufficient for the performance of said order, and, upon failure so to do, shall order him to jail until it is complied with, or the woman and said county court consent to his discharge. So that the proceeding would take this course, and the money not be paid to the woman, but to the county court, and her consent, without the concurrence of the county court, would not discharge him; and, so far as the consideration of said notes depended upon the discharge of said Thomas Clelland, said Belle Morley contracted to do something which she had no power to do, and which she has never done. The notes executed by said Z. Clelland to said Belle Morley being common-law paper, the plaintiff, Billingsley, took them by assignment, subject to all of the equities between her and the said Z. Clelland. He acquired thereby such rights as she had—nothing more.

The plaintiff, Morgan Billingsley, filed a special replication to the answer of Mary E. Clelland, in which he alleged that, if said Mary E. Clelland ever advanced or furnished any of the money in said answer mentioned and set out, said money was furnished to her husband prior to the enactment of the married woman's statute of this state, and it became and was the property of her said husband, and that said money, if furnished at all, was so furnished more than five years next before the bringing of this suit or the filing of said answer.

The said Mary E. Clelland, in her answer, denied any collusion with her husband and Charles E. Clelland in making the transfers of said seventy five acres of land to her, or that it was done to cheat and defraud said Belle

Morley, and there is no proof in the cause that she had any notice of the intention of said Z. Clelland to compromise said proceeding with Belle Morley.

At the hearing the court rendered a decree setting aside said conveyances as fraudulent, and directing a sale of said land to satisfy the plaintiff's claim, which was ascertained to be two hundred and seventy six dollars and thirty nine cents, including interest and costs, and this appeal was obtained.

Did the court err in overruling the demurrer to plaintiff's bill? In considering this question, our attention is first directed to the fact that said deeds were placed on the public records on the same day on which they were executed, and in this way notice was given to the world of the fact; and the said Belle Morley, at the time said notes were executed to her by Zackwell Clelland, and the said Morgan Billingsley, at the time they were so placed on record, were bound to take notice of the fact.

As to the consideration paid for said land, it appears in the testimony that several hundred dollars which said Mary E. Clelland derived from her father's estate went into that purchase. Mary E. Clelland, in her deposition, stated that she inherited from her father an undivided one-fourth interest in what was called the "McElroy Place," which her brother John bought from her for four hundred dollars and which he paid for her on the purchase money of the land in question; and while the commissioner who sold the land reported that it was purchased by Zackwell Clelland, and he also states it was paid for by him, yet several witnesses state that said Clelland was not present at the sale, and that it was bid in by the brother of said Mary E. The commissioner would rely to some extent upon his report; and, after so long a time, may have forgotten the facts, but the defendant states that she knows that her money paid for the land. Be that as it may, it was conveyed to her by her husband when he owed no debts. It is alleged that Zackwell Clelland, at the time he effected the compromise with Isabella Morley, on the 8th day of June, 1891, represented to her that he was the owner of said seventy five acres of land, and thereby induced her to

take his note for the two hundred and fifty dollars he was to pay her by way of compromise. Suppose this to be true; the plaintiff, in his bill, is seeking to overthrow the title of Mary E. Clelland, and the declarations of her grantor, made subsequent to the deed, can not be used to invalidate her title. In the case of *Casto* v. *Fry*, 33 W. Va. 449 (10 S. E. 799) Snyder, J., in delivering the opinion of the Court, said: "The law is well settled that the declarations of a grantor, made subsequent to the conveyance, are not admissible to affect the title of the grantee;" citing *Gillespie* v. *Burleson*, 28 Ala. 551; *Gill* v. *Strozier*, 32 Ga. 688; 1 Whart. Ev. § 1165, where it is said, "as a general rule applicable to all cases of declarations, against proprietary interests, such declarations, made after the declarant has parted with his interest, can not be received to affect the title of a *bona fide* grantee, donee, or successor." See, also, 3 Cow. 612, in the case of *Osgood* v. *Manhattan Co.* where it is held that "declarations of a grantor after executing a conveyance are not admissible to the prejudice of his grantee." There is no allegation in the bill that Zackwell Clelland owed a dollar in the world at the time he conveyed said land to his wife, and in making said conveyance he did no more than what he had a perfect right to do. It is alleged, however, that said Clelland made said conveyance with the express purpose and premeditated intent of committing a subsequent fraud upon Belle Morley, by inducing her to take his notes for the amount he agreed to pay her by way of compromise of said bastardy proceedings. Mary E. Clelland denies notice of any such intended fraud. We have already discussed the question as to whether there was any valid consideration for said notes, by showing that said Belle Morley agreed to do something that was beyond her power, and our conclusion is that she could not have enforced the collection of said notes against said Z. Clelland, if he had never conveyed said property to his wife. As to the validity of such a compromise, Hutchinson, in his West Virginia Treatise, in section 1497, says upon this point: "As the object of the proceeding is to relieve the public of the charge of maintaining the illegitimate child, by requiring its father to discharge his natural

duty, after the commencement of the proceedings the accusation can not be compromised by the woman and the accused, without the express consent of the county court; for, although the proceedings may be carried on by the woman in her own name, the judgment of the court, if the defendant be convicted, is to require him to pay the money assessed, to the county court, for the maintenance of the child; so that the county court alone has control of the funds payable by the father in such case. Therefore it should not permit any contrivance on the part of the accused with the unfortunate, weak, or foolish woman, by which the natural duty and legal obligation of the father may be lessened or evaded." The reason of this law is manifest. The object of the law is to prevent the child from becoming a county charge, and if the woman is allowed to control the proceeding, and dismiss it for a few dollars, get possession of the money, and squander it, the very object of the law will be defeated, the money expended, and the helpless child become a burden upon the county. In Ohio the statute provides for a compromise of such cases. See Swan, Just. (16th Ed.) p. 491. The statute reads as follows: "If during the examination before the justice or at any time before judgment in the court of common pleas the accused pay or secure to be paid to the complainant such amount of money or property as she may agree to receive in full satisfaction, and give bond to the state of Ohio with sufficient security, to be approved by the justice, court or judge in vacation, conditioned to save any county, township or municipal corporation within the state free from all charges for the maintenance of such bastard child, the justice, court or judge in vacation shall discharge the accused from custody, upon payment of the costs of prosecution, but such agreement shall be made or acknowledged by both parties in the presence of the justice, court or judge, who shall enter a memorandum thereof upon his docket or cause the same to be made upon the journal."

We must therefore regard the contract between Zackwell Clelland and Isabella Morley as an illegal one, as being against public policy and in contravention of law. Under the head of "Illegal Contracts," 9 Am. & Eng. Enc.

Law, p. 880, it is said: "An illegal contract, distinguished from those which are void for want of essentials, is an agreement with an unlawful object. It is not merely lacking in valid subject-matter, but its purpose is positively invalid." Speaking of the term "public policy," it is said: "This term is equivalent to 'the policy of the law.' It is applicable to the spirit as well as the letter. Whatever tends to injustice or oppression, restraint of liberty, commerce, and natural or legal right; whatever tends to the obstruction of justice, or to the violation of a statute; and whatever is against good morals—when made the object of a contract, is against public policy, and therefore void and not susceptible of enforcement." And again, on page 907, under the title, "Contracts to Obstruct Justice and Duty. (1) To Suppress Prosecution," it is said, "When the object of the contract is to prevent legal proceedings, to the defeat of justice and hindrance of the due course and administration of the law, it is against public policy, and the agreement is void." Now, it is alleged in the bill, as before stated, that the three notes, for eighty three dollars and thirty three and one-third cents each, were executed by said Zackwell Clelland to said Isabella Morley in consideration of the compromise of the bastardy proceedings which she had instituted against his son Thomas Clelland; and the object of the bill brought by Morgan Billingsley, as assignee of said Isabella Morley, is to enforce the collection of said notes. It appears, however, on the face of the bill, that the notes were executed in consideration of a compromise which the said Isabella Morley had no right to make, and in pursuance of an agreement to release the son of said Z. Clelland from a prosecution which was for the benefit of the public, the proceeds of which, if successful, would go into the hands of the county court, to prevent the child from becoming a public charge—a prosecution which she had no power to dismiss without the consent of the county court; which notes were therefore executed without consideration, and which compromise was illegal and void. It is true that in the case of *Burgen v. Straughan*, 7 J. J. Marsh. 583, under the old statute of 1795, it was held that a suit could be maintained upon a promissory note executed

by the father to the mother for the maintenance of his bastard child. This decision was rendered in 1832, but in the same state, in 1869, in the case of *Com.* v. *Davis*, 6 Bush, 295, it was held that a bastardy proceeding could not be dismissed by the mother. The syllabus of the case reads as follows: "After a bastardy proceeding has been initiated, and the court has acquired jurisdiction over it, the mother has no legal control over it. On motion of the mother, the court dismissed the proceeding. The judgment is reversed on appeal of the commonwealth, and the cause remanded for further prosecution for the relief of the county and the benefit of the bastard." In the case of *Com.* v. *Turner*, 4 Dana, 511, while it was held in 1836 that the mother might agree with the father of the child for contribution towards the child's support, and the agreement would be binding on him, yet it was held that "no agreement between the mother and the putative father would bar a proceeding under the statute to compel him to give security for the support of the child." Chief Justice Robertson, delivering the opinion of the court, said: "And, of course, it would be unreasonable and inconsistent that any agreement between herself and the person charged with being the father of her child should be admitted as a legal bar to the proceeding, and an insuperable obstacle to the effectuation of the provident purposes of a wise and salutary law, enacted chiefly for the beneficient end of enforcing paternal obligation to the most forlorn condition of infancy. Could a poor and ignorant and wretched mother thus control such a proceeding once commenced, artful and unprincipled fathers of bastard children might unjustly elude the power of the law, and fraudulently frustrate its wholesome policy, by false and inadequate promises, unsecured, and never to be fulfilled, or, if performed, not for the children's benefit, and thus unfeeling fathers of destitute infants could control a public law made to control them. This can not be admitted to be the doctrine of the law." An examination will show that the Kentucky statute upon this subject is almost identical with ours. The supreme court of Vermont in 1859 had this question before it, in the case of *Smith* v. *Pinney*, 32 Vt. 282; and it was there held

that "if a woman authorize her agent to settle a civil prosecution in her behalf for bastardy, and such agent settle it by taking a note to his principal, the consideration of which is not only the settlement of the civil complaint, but also the execution of a written agreement on the part of the woman not to instigate or testify in any criminal prosecution against the defendant, such note is illegal, and can not be enforced." In New York, in the case of *People* v. *Mitchell*, 44 Barb. 245, it was held that "the superintendents of the poor have no authority or power to discharge the putative father of a bastard child from the obligation he has entered into with the town by giving bond for the support of the child, without some compensation or equivalent which will effectually secure the support and maintenance of the child in the manner contemplated by the statute, or at least tend to assure such support." In the case of *Martin* v. *State*, 62 Ala. 119, while it is held that such a compromise was binding, and a bar to further prosecution, yet Judge Stone quoted with approval the language of Chief Justice Dargan in *Wilson* v. *Judge Co. Court*, 18 Ala. 757, "But for the decisions heretofore made by this court, I should be very reluctant to hold that the mother of a bastard, after she had instituted proceedings against the putative father, could compromise the cause and dismiss the prosecution." In the case of *Getzlaff* v. *Seliger*, 43 Wis. 297, it was held that: "(1) While a complaint in bastardy is still pending in justice's court, the parties may make settlement, subject to the approval of the supervisors, to be entered upon the justice's docket, and, upon the defendant's giving a satisfactory bond of indemnity to the supervisors, the justice should discharge him. (2) After the defendant in such proceedings has been committed, or held to bail, to answer in the circuit court, by order of the justice, the latter has no further authority in reference to a settlement, or to a discharge of the defendant from custody, but jurisdiction of the proceeding is thenceforth in the circuit court. (3) If after the accused, in such case, has been held to bail or committed, the parties may still settle, at least with the approval of the circuit court (a point not decided) yet the accused will not then be entitled to his discharge in that

court without indemnifying the supervisors to the satisfaction of the court." See, also, *State* v. *Wilson*, 24 Ind. 273, on the same point. See, also, *Reeves* v. *State*, 37 Ind. 441, where it is held, "A compromise for suit for bastardy, made out of court, though in the form of the statute, is no defense to the action, unless ratified and confirmed in court, and entered of record, with the consent of the prosecutrix."

Other cases might be cited from different states, but these are sufficient to indicate the policy of the law in such cases; and from these it is clearly shown that the object of the law in all of these states is to prevent the unfortunate child from becoming a charge upon the public, and the law will allow no agreement with the mother, or payment of money to her, after such proceedings have been initiated, to stifle such proceedings, or cause their dismissal, without proper security from the accused to protect the public interest. And, as before stated, these notes having been executed by said Z Clelland to said Belle Morley in consideration of her agreement to do something which she had no power to do, and which she seems never to have attempted to do, said notes are without any valid consideration, and can not be enforced, and for these reasons the demurrer should have been sustained.

It is further assigned as error that the court should not have decreed a sale of said land without having first ascertained and fixed the amounts of the debts of said decedent's estate, and the liens on said lands, and their priorities, and without having referred the cause to a commissioner to ascertain and report what amount of personalty of said decedent's estate was subject to the payment of said notes and judgment; but, as I am of opinion that the plaintiff had no right to subject said land to sale to pay said claims, it is unnecessary to pass upon these points. The decree complained of should be reversed, and the bill dismissed, with costs.

DENT, JUDGE:

On the 6th day of January, 1891, Belle Morley having previously made complaint that Thomas Clelland was the father of a female bastard child, of which she was delivered on the 23d day of February, 1890, the said Thomas Clel-

land and Z. M. Clelland entered into a recognizance for his appearance before the Circuit Court of Marion county at its next term to answer said charge. At the next term the defendant made his appearance, and had said case continued.

On the 5th day of June, 1891, shortly before the July term of said court, the said Z. M. Clelland, by two separate deeds, conveyed all his property, both real and personal, through his nephew Charles Clelland, to his wife, Mary E Clelland, and had said conveyances immediately admitted to record.

On the 8th day of June the said Z. M. Clelland went to Forksburg, in said county, and, taking W. C. Doughterty, a justice of the peace, went to the residence of Mrs. Morley, and the two persuaded Belle Morley to compromise her claims against said Thomas Clelland for the sum of two hundred and fifty dollars. She expected payment in cash, and when he offered to give his notes, and she objected because of his financial standing, the justice informed her that his standing was good; that he owned a tract of land, and a large amount of personal property—to all which the said Clelland assented. She then agreed to the compromise, and signed a release "releasing Tom from everything pertaining to the case—all debts, dues and everything." The justice says that he was not aware at the time that Clelland had made everything out of his hands, or he would not have had anything to do with the matter.

Afterwards, Belle Morley assigned said notes to the plaintiff, who brought suit, and obtained a judgment and execution on one of the notes, but was unable to make the same, as said Z. M. Clelland banteringly claimed he had no property, and he did not intend to pay said notes. The plaintiff then brought this suit to set aside said conveyance of the land to Mary E. Clelland as fraudulent and void as to said notes. During its pendency, and before hearing, Z. M. Clelland died, and the suit was revived in the names of his administrator and heirs. Such proceedings were then had therein that on the 23d day of March, 1893, a decree was entered holding said conveyance void as to said

notes, and, in default of the payment thereof, said land was decreed for sale.

From this decree certain of the defendants, including Mary E. Clelland, the only party prejudiced thereby, appeal. Numerous errors are assigned, some of which are merely technical and trivial; among others, that the administration account was not settled, when it is clearly shown that Zackwell M. Clelland had conveyed all his personal property to his wife, and had nothing at his death, and hence there was nothing to administer and nothing to settle. Another is that the creditors were not convened. This has heretofore been held by this Court to be unnecessary. *Core* v. *Cunningham*, 27 W. Va. 206; *Duncan* v. *Custard*, 24 W. Va. 730; *Murdock* v. *Wells*, 9 W. Va. 552. There are, however, three important questions presented:

1. Was the compromise made by Belle Morley with Z. M. Clelland contrary to public policy and good morals, and the notes sued on by reason thereof invalid? Whenever this question on similar notes has been fairly presented to a court of last resort, the uniform decision has been in favor of their validity, unless the compromise has been procured by fraud, or the notes include an obligation not to testify against the accused in a criminal prosecution. In the case of *Martin* v. *State*, 62 Ala. 119, it was held to be the settled law of the state that "the mother of a bastard, after she has commenced proceedings against the putative father, may compromise the case and dismiss the prosecution, and a *bona fide* compromise is a bar to the further maintenance of the prosecution." It is true the chief justice, while holding this to be the settled law of the state in *Wilson* v. *Judge Co. Court*, 18 Ala. 757, expressed a doubt whether the court would so hold if it were a new question, but, being settled by numerous decisions, the court was not at liberty to disturb it. Such expressions as these are usually nothing but meaningless sugar-coats to a bitter pill. See, also, *Merritt* v. *Flemming*, 42 Ala. 234. In *Jackson* v. *Finney*, 33 Ga. 512, it was held, "Forbearance by the mother to prosecute the putative father of a bastard child under the bastard laws of this state constitutes a sufficient consideration to support a promise by such a father to pay

money, or settle property, for the benefit of such offspring."
And *Davis* v. *Moody*, 15 Ga. 175, held that "the liability,
by statute, of the putative father of a bastard child to
maintain the same, is a good consideration for a settlement
made in trust for the benefit of the mother." See, also,
*Hargroves* v. *Freeman*, 12 Ga. 342. In the case of *Com.* v.
*Turner*, 4 Dana, 511, Chief Justice Robertson, delivering
the opinion of the court, says: "It has been more than
once decided by this court that a warrant, at the instance
of the mother, for compelling the father of their illegiti-
mate child to contribute to its maintenance, is not a crimi-
nal or penal prosecution, but is in the nature of a civil pro-
ceeding for enforcing an obligation both natural and civil,
and that it is so far for the mother's benefit that if she suc-
ceed she may have a judgment for costs; and that also she
is neither under any civil or moral obligation to institute
such a proceeding, nor is guilty of any breach of public or
social duty by agreeing with the father for a conventional
contribution in lieu of the statutory remedy for coercing
him. And as a deduction from these doctrines it was de-
cided in *Burgen* v. *Straughan*, 7 J. J. Marsh, 583, that such
a voluntary agreement would not be necessarily immoral,
illegal, or invalid, as between the parties, and might there-
fore be enforced against the father of the bastard." It
was held in this case that a compromise between the moth-
er and father, while good between them, would not be a
bar to a prosecution in the name of the state to compel the
putative father to give security for the support of the child,
especially if the mother objected to his discharge until
he did so, the court saying: "Then let such men make
their contracts, and perform them, too. But let them
also know that, if their illegitimate children are not prop-
erly maintained, the law still has power to coerce adequate
contributions from those whose natural and legal duty it
was to make them without solicitation or coercion, and
that, in whatever they do or agree to do by voluntary con-
tract, they depend altogether on the honor and fidelity and
personal responsibility of those with whom they negotiate.
Such contracts, if fair, are not illegal. But they can not
paralyze the law, if those who have a right to its protec-

tion invoke its interposition in the mode prescribed by the statute." In the case of *Com.* v. *Davis*, 6 Bush, 295, the court simply approves the decision in the case of *Com.* v. *Turner*, above, to the effect that "after the proceeding has been initiated, and the court has acquired jurisdiction over it, the mother has no legal control over it." This in no sense pretends to hold that the father and mother may not com promise a bastardy proceeding, but simply that the mother can not dismiss the proceeding without the assent of the court. The object of the law is plain, and that is to secure the maintenance of the child by its parents, and prevent it from being a public charge. If either the father or mother do this, the county or state has no grounds of complaint or interference. The father has the right to make his compromise with the mother to support the child, but, if the father fails to comply with the terms of the compromise, the mother can still, notwithstanding a fraudulent or unfulfilled compromise, invoke the aid of the commonwealth to compel him to perform his duty. Or, if the mother allows the child to become a county charge, the prosecution can still be proceeded in for the protection of the public. If the compromise is fair, and faithfully carried out, and the child does not become a public charge, and the mother faithfully supports it, the commonwealth can not sustain its prosecution; and, while the mother can not legally dismiss, it will finally abate for *want of cause* of prosecution. The end is thus just as effectually attained as though the prosecution had never begun. The public is saved, the woman protected, the child maintained, and no one has grounds of complaint. In the case of *Baker* v. *Roberts*, 14 Ind. 552, it was held, "The mother of a bastard may settle and dismiss a bastardy suit brought on her relation." In the case of *Harter* v. *Johnston*, 16 Ind. 271, a note for five hundred dollars given to compromise a case of bastardy, and prevent proceedings therefor, was held valid; the court saying that as the mother alone had the right to institute such proceedings, she had the right to compromise them. In the case of *State* v. *Wilson*, 21 Ind. 273, it was held that a compromise obtained of a mother would not bar her right of action, unless such agreement and ad-

mission were entered of record with her consent. The same thing, virtually, was held in *Reeves* v. *State*, 37 Ind. 441. In the case of *Malson* v. *State*, 75 Ind. 142, it was held that while an adult mother could compromise and dismiss a bastardy proceeding, an infant relator could not do so without the consent of the court; the object being to prevent the putative father from committing a fraud upon the infant. In the case of *Coleman* v. *Frum*, 3 Scam. 378, the supreme court of Illinois held, "A bond given by a father of an illegitimate child to the mother, in consideration of her agreement to dismiss a prosecution for bastardy pending against him, is founded upon a valid consideration." The supreme court of Iowa, in the case of *Holmes* v. *State*, 2 G. Greene, 501, held a bastardy proceeding to be a civil action to secure to the woman a speedy remedy for the support of her child, and that the mother might dismiss the prosecution, settle the matter, and release the defendant, if she chose. And this was approved in the case of *Black Hawk Co.* v. *Cotter*, 32 Iowa, 125. In the case of *Maxwell* v. *Campbells*, 8 Ohio St. 269, Judge Brinkerhoff, in sustaining notes given in compromise proceedings, says, on page 269: "Fair and honorable compromises between parties perhaps equally guilty, who are about to become the parents of illegitimate offspring, are not only dictated by sentiments of honor and duty, but are in entire harmony with the policy of our statutes. And had there never been any prosecution in this case, and, without the pressure of a prosecution, the defendant had voluntarily come forward and executed these notes, they would have been, as they now are, good in law, because based on the consideration of not only a moral, but also a legal, obligation to provide to some extent for the expenses and support of both mother and child." And in the case of *Kezartee* v. *Cartmell*, 31 Ohio St. 522, the court held a compromise of such proceeding, obtained through fraud, was no bar to a subsequent prosecution; that when such agreement or settlement was induced through fraud, it is voidable at the election of the mother or prosecutrix. In the case of *Hook* v. *Pratt*, 78 N. Y. 371, the supreme court of New York held that "an undertaking upon the part of the putative father of an

illegitimate child to pay to the mother a sum of money for the support of the child is not illegal." In the case of *People* v *Mitchell*, 44 Barb. 245, the supervisors undertook to compromise a bastardy proceeding with the putative father without consulting the mother, and, as part thereof, the father was to take and support the child. The court held that the mother was entitled to the child, and a compromise without her consent was invalid. In the case of *Holcomb* v. *Stimpson*, 8 Vt. 141, held: "The compromise of a prosecution under the statute relating to bastards and bastardy is a good consideration for a promissory note executed for that purpose by the defendant." "Such a prosecution is a civil suit, and may as well be made the subject of a compromise as any other civil suit." In *Sherman* v. *Johnson*, 20 Vt. 567, held, "A release executed by the mother to the putative father of a bastard child, purporting to discharge all claim upon him on account of his being the father of the child, will only operate to release the claim of the mother," but will not in any manner affect the rights of the public. In *Humphrey* v. *Kasson*, 26 Vt. 760, held that, "where the mother prosecutes the suit for her benefit, such release, pleaded in bar, is a good defense at law." In *Smith* v. *Pinney*, 32 Vt. 282, the compromise note of a bastardy proceeding was held invalid because the obligee obligated herself not to appear and testify in any criminal proceeding against the obligor, which obligation, being contrary to public policy, vitiated the contract.

These authorities establish beyond controversy or quibble the right of a mother to compromise a bastardy proceeding, in so far as her rights are concerned; and if such contract of compromise is reasonable in its terms, and fair as to her, the courts will uphold the same, and compel the putative father, or other person obligating himself for him, to pay any note given in such settlement. But if such compromise is effected through fraud on the part of the putative father, or his representative, the mother may avoid it. But no such compromise is binding on the county court or state; unless it assents thereto, but neither the county court or state has any right to interfere therewith as long as the mother is satisfied, and as the natural guar-

dian or custodian of the child, maintains and supports it, and prevents it becoming a public charge. The only reason that a county court would have the right to prosecute such proceeding, independent of and against the mother's will, would be because the child was already or likely to become a county charge. The county court can not now as formerly the overseers of the poor could, in this state, institute such proceedings, but the mother only can do this. After it is instituted it may be proceeded in in the name of the woman, or, if the court so order, in the name of the county court. As long as it is carried on in the name of the woman, she should have the right to control and dismiss it, as she is liable for costs unless the county court will permit it to be carried on in its name, and the circuit court so order.

The pretense that Belle Morley bound her self to do something she could not legally do is wholly untenable, and not justified by the evidence. She was an unsophisticated, inexperienced, country girl, who had been wickedly duped and wronged, as she claimed, by Thomas Clelland. His father, Z. M. Clelland, for the purpose of keeping him out of jail, went on his bond for his appearance to answer the charge of bastardy; then, fearing the result of his obligation, proceeded to transfer all his property, both real and personal, out of the reach of the law. Not satisfied with this, but fearful that Thomas would have to go to jail as soon as his duplicity is found out (in getting rid of his property, and thus rendering the bail bond a straw one) he takes a justice of the peace, a representative of the law (one who women and children suppose, at least, is fully acquainted with the law and judicial proceedings) and, by representing the disgrace and scandal of a court trial, persuaded this unfortunate girl (who had, seemingly, no other adviser than her mother) to compromise all her claims against Thomas for two hundred and fifty dollars. The release is not in evidence, but the Clellands must have it. The justice says, "I then drew up a general release, releasing Tom from everything pertaining to the case—all debts, dues, and everything." After signing which, she expected the money, but this grey haired schemer, knowing that

he had rendered himself insolvent, and, as he thought, "law proof," insists on her taking his notes. And she objects because she does not know his financial condition. And the justice tells her he is perfectly good; that he owns land, cattle, horses and other valuables, and Clelland assents thereto, although he knows he has tried to fix himself so that not one dollar can be made off of him. This contract, as to her, was grossly fraudulent, but she alone has the right to avoid it. As far as Clelland is concerned, he got all he contracted for, and that was a release from her as to all her rights. Clelland knew what he was doing. He was acting strictly under legal advice, just as when he made disposal of his property. She was entirely ignorant of her rights, and the law, other than as she got it from the justice. The justice says, if he had known that Clelland had disposed of his property, he would not have had anything to do with this compromise. Mere constructive notice of deeds recently recorded will never be permitted to be used as a cover for conduct grossly fraudulent towards innocent and unsuspecting females, who have little acquaintance with judicial proceedings, or the recordation of legal instruments. Belle Morley agreed to release Thomas, and she has faithfully carried out her contract. The bastardy proceedings, so far as he is concerned, are dead. The only order that was ever entered therein was an order of continuance, at his instance, at the March term, 1891. His bond is worthless. At the July term to which the case was continued, no order was made. In the case of *Grieve* v. *Freytag*, 31 Ohio St. 147, it was held that the failure of the court to continue the case regularly would deprive it of jurisdiction of the defendant, and vacate his bond, so that a judgment thereon would be void. *Gebhart* v. *Drake*, 24 Ohio St. 177. So that the failure of the county court to continue the bastardy proceeding regularly at the July term, 1891, was virtually an assent to the compromise, as it effected the final discharge of the accused, in so far as the county court was concerned. And in so far as this defendant is concerned, the case is as fully and completely at an end as though it was dismissed. The child is now too old for the proceedings to be renewed

against him, as it has been more than three years since they were instituted. Section 2, chapter 80, Code, is parallel with the Ohio statute, and provides for regular continuances from term to term, in default whereof the recognizance would cease to be in force, and the suit would abate, through failure to prosecute.

Thomas sets up the plea of not guilty. This plea comes too late to avail. His conduct belies his words. If he is as guileless as he now pretends to be, why was he not prompt, eager, and ready for trial at the first term, instead of obtaining a continuance? He says that he did not know anything about the compromise until a month or two after it was made, and then he was informed by a man by the name of Stanton, now dead; and yet he was living at home at least part of the time, and the July term of court, to which he was still recognized to appear, intervened. This is certainly an incredible story. That his father would compromise the matter to release him, and yet not inform the beneficiary about it, is not in accord with ordinary human conduct, especially as it was necessary, in absence of a settlement, to get ready for his trial. If all his evidence is to be judged by this statement, it can be given but little weight. His innocence probably did not occur to him until he found out his mother was in danger of losing her property by reason of the false charge against him. His awakening now comes too late, for in the case of *Holcomb* v. *Stimpson, supra*, it was held that, "when a promissory note is given to compromise a contingent liability, the note can never be avoided by showing that the maker of the note was not in fact or law liable." Nor can a note given in compromise of bastardy proceedings "be avoided by showing that the person accused could not have been the father, unless fraud or imposition in bringing about the compromise be also shown." The court also says: "The surceasing of a suit, even for a time, is always a good consideration for a promise. So, also, is the compromise of a doubtful claim." And in the case of *Martin* v. *State, supra*, the court says: "A compromise made or offered is not evidence of the justness of the claim agreed or offered to be compromised. Parties sued, or against whom a claim is

preferred, may purchase their peace, or otherwise compromise such claim; and if, in such negotiation, they make no admission of fact material to the maintenance of the claim asserted, such offer or promise can not be received in evidence that the claim made is just." So the innocence or guilt of Thomas Clelland has nothing to do with the determination of this case.

Compromises of all civil suits are always encouraged by the law, and if the ends of justice can be effected thereby, it is far better for all parties concerned. And more truly is this the case in bastardy proceedings, as it keeps much scandalous matter from becoming public property, and saves the expense of a useless trial. To hold the notes in controversy invalid for the sole reason that the woman had no authority to bind the county court, and thus let a doubtful Thomas, acting through a scheming father, escape the duty he owes towards his bastard offspring, would be a perversion of justice, and a permitting of that which the law intends "as a shield for an unfortunate, weak, or foolish woman to be converted into a sword to pierce her."

2. The second contention of appellants' counsel is that the assignment of the notes to the plaintiff did not carry with it the right to attack the fraudulent conveyance from Z. M. Clelland to his wife. On this question I include notes made by JUDGE BRANNON, in which I concur. They are to the effect that an assignment of a note carries with it all the remedies of the assignor, including the right to attack a fraudulent conveyance, and are as follows, to wit:

"When choses in action could not be assigned, because to allow their assignment tended to beget maintenance and champerty, there may have been something in the position, though equity limited the restriction long ago; but many, many years ago the Virginia legislature made debts assignable, and the law is well settled that the assignee can sue in his own name, or he can sue in the name of the assignor, without power in the assignor to prevent him. Hogg, Pl. & Forms, 13; *Whitaker* v. *Gas Co.*, 16 W. Va. 717; *Kimmons* v. *Wilson*, 8 W. Va. 584. Being thus lawfully the owner of the debt, and possessing remedies for its recovery in his own or his assignor's name, why can

33

he not bring a suit to avoid a fraudulent conveyance which
his assignor could have brought? The assignor had that
right, and it accompanies the debt when assigned. The
right to go on the property is not one annexed to the per-
son of the creditor, but to the debt. Wait, Fraud. Conv.
§ 92, says that the 'right to avoid a fraudulent conveyance
is not personal to the then existing creditor. His succes-
sors and assigns may enforce the right. Thus, the sub-
sequent purchaser of a pre-existing note may attack a
transfer. Campbell, J , says, No change in the ownership
or form of the debt affects the right incident to the debt—
to attack a conveyance fraudulent as to it.' See Bump,
Fraud. Conv. 506; 2 Bigelow, Frauds, 423. Prof. Minor,
in 2 Inst. 690, says the right to attack such conveyance ex-
tends to the 'original creditor, or his assignee.' *Clough* v.
*Thompson*, 7 Gratt. 26, and *Staton* v. *Pittman*, 11 Gratt. 99,
conceding the right to the sheriff, as assignee of an insol-
vent, would, as Minor thinks, sustain the right of any as-
signee, as the right to collect and the title are the same in
one case as in the other. The Maryland act recognizing
assignments is like ours, and in *Schaferman* v. *O'Brien*, 92
Am. Dec. 708, the assignee's right to assault a fraudulent
deed is recognized; the court saying that only the old com-
mon-law doctrine against assignments could be alleged
against it, and the statute abolished that. Our Code, c 74,
s. 9, is broad, saying that the words 'creditors' and 'pur-
chasers,' within the meaning of the chapter avoiding fraudu-
lent acts, include any one who, but for the fraudulent act,
would have a right to subject the property. I think the
authorities cited by the counsel for appellants do not ap-
ply on this point. I concede that an assignment of a naked
right to sue for a fraud is not assignable, as, where one by
fraud acquires property of another, the mere right to sue
for it is not assignable, and a second purchaser from the
vendor of the property can not have the right to set aside
the deed to the first purchaser, procured by fraud. So he
could not set aside a judgment procured by fraud against
his vendor. That is a different matter. It is not in nature
assignable at common-law, and the words 'bond, note,
account or writing,' in section 14, chapter 99, Code (the

statute authorizing assignments) do not cover it.   Therein
lies a difference.   See, about non-assignability of demands
based on frauds and torts, and also inability of assignees to
sue to annul transfers in fraud of them, *Hunt* v. *Conrad*
(Minn.) 14 Lawy. Rep. Ann. 512, note; s. c.  50 N. W. 614;
*Whitney* v. *Kelley* (Cal.) 15 Lawy. Rep. Ann. 813, and note;
s. c. 29 Pac. 624; 2 Story, Eq. Jur. 1040g; Bigelow, Frauds,
214.

"I am not satisfied that the notes given in a compromise
of bastardy proceeding are *contra bonos mores*.   The county
can disregard the contract, it is true; but if it does not and
the party is not able to plead failure of consideration, can
he say the contract is void?   Can he be heard to allege the
illegality?   I hardly think it void as against public policy."

3. That the deed executed by Z. M. Clelland to Mary
Ellen Clelland was not fraudulent as to the notes in con-
troversy, and, if so, the grantee had no notice of the fraud,
and did not participate therein.   The circumstances of this
case fully establish the fraudulent intent on the part of
grantor, Z. M. Clelland.   From the time he went on
Thomas' bond, until he secured by his fraudulent repre-
sentations, and those unwittingly made by the justice with
his assent and in his presence, a release of all her claims,
from Belle Morley, against his son, Thomas, his conduct
evinces the fraudulent scheme he was laboring to effect,
and which he finally accomplished according to his intention
and design; and that was to release Thomas from the prose-
cution, and himself from his bond, and get the prosecutrix
to accept in satisfaction his worthless paper.   No deeds were
ever more carefully prepared than the four deeds through
which he conveyed all his property, both real and personal,
to his wife.   Why have deeds made and recorded for the
personal property, if he was free from debt?   Gifts from
husband to wife are upheld, except as to creditors.   Did
he do this with the intention of becoming indebted before
the recordation of these deeds was found out, and then
taking advantage of constructive notice to defeat the re-
covery of such indebtedness?   If so, he fully accomplished
his purpose, and the law presumes that such was his inten-
tion.   "What a man does is what he intends to do," is a

safe maxim, and the duty devolves on him of showing to the contrary; that is, that he did not do what he intended to do.    It does not matter whether fraud is directed towards prior or subsequent creditors; it avoids a convey-ance, unless it be to a *bona fide* purchaser for value, without notice.    A voluntary grantee is not entitled to notice of fraud.    The property in controversy was purchased in the year 1865, at a judicial sale, which was reported as made and confirmed to Z. M. Clelland; and on the 29th day of May, 1867, a deed was executed to him for the same by the commissioner, acknowledging the purchase money in full. So it stood in his name, as his property, for twenty four years, and until he conceived the fraud he perpetrated on said Belle Morley, and then he conveyed indirectly to his wife.

Under the law as it was at the time of the purchase, the husband was entitled to the wife's personal property, and there could be no resulting trust in her favor, considering the money came through her, as it was legally his, and the land purchased with it would belong to him.    And, if he ever intended to deed it to her, he should have done so be-fore he entered upon the perpetration of the fraud he suc-ceeded in accomplishing in this case.    If it is her separate estate, both since and prior to the Code of 1868, and she permitted him to invest it in property in his own name, no resulting trust will be raised in her favor, but it will be presumed to be a gift.    *McGinniss* v. *Curry*, 13 W. Va. 29; *Hamilton* v. *Steele*, 22 W. Va. 348; *Deck* v. *Tabler*, 41 W. Va. (23 S. E. 721).    In the case of *Burt* v. *Timmons*, 29 W. Va. 441 (2 S. E. 780) it was held that "a transfer of property, either directly or indirectly, by an insolvent husband, is justly regarded with suspicion; and unless it clearly appears to have been entirely free from intent to withdraw the property from the husband's creditors, or the presumption of fraud be overcome by satisfactory affirmative proof, it will not be sustained."    *Miller* v. *Cox*, 38 W. Va. 747 (18 S. E. 960) *Bank* v. *Atkinson*, 32 W. Va. 203 (9 S. E. 175) *Max-well* v. *Hanshaw*, 24 W. Va. 405.

In this case the husband rendered himself insolvent by transfers to his wife with intent to defeat the then pending

bastardy proceedings, which intent he proceeded immediately to carry into execution. His conveyance to his wife, directly or indirectly, must be regarded as voluntary, and being made with fraudulent intent as to creditors, whether prior or subsequent, must be held void as to such creditors. For these reasons the decree should be affirmed.

Affirmed by an equally divided court.

Holt, President, concurring with English, Judge, and Brannon, Judge, concurring with Dent, Judge.

---

# CHARLESTON.

