# CHARLESTON.

## BANK v. ATKINSON.

*(GREEN, JUDGE, Absent.)

Submitted January 18, 1889.—Decided February 16, 1889.

1. HUSBAND AND WIFE—SEPARATE ESTATE.

A husband with the knowledge and consent of his wife at different times receives, or she delivers to him, the proceeds of the sale of her realty, gives her no note or written obligation to repay it, mingles it with his means, uses it in his business for years, keeps no written account of such moneys, nor does she, then becomes insolvent and some eight or ten years after his receipt of the money purchases real estate in the name of his wife; and it is alleged by him and her, that it was paid for with the money so received; and several years afterwards he and she unite in a deed of trust to secure a very considerable debt on said real estate, such debt being a loan to the husband; and before such purchase a judgment is rendered against him for a debt. The lot is liable to the judgment. (p. 205 *et seq.*)

2. HUSBAND AND WIFE—SEPARATE ESTATE—STATUTE OF LIMITATIONS.

If, when such purchase is made, any claim, which she may have on him for such proceeds of her real estate, is barred by limitation, that circumstance tends strongly to repel the wife's claim to exempt the land against creditors. (p. 205 *et seq.*)

3. HUSBAND AND WIFE—PRESUMPTION OF LAW—EVIDENCE.

The law will not from the mere delivery by the wife of her money to the husband or from the permitted receipt by him of her separate estate imply a promise by him to repay her, but will require more,—either an express promise, or circumstances to prove that in such matters they dealt with each other as debtor and creditor. To thus raise a debt against him to the prejudice of creditors, the proof must be clear, full and above suspicion. (p. 205 *et seq.*)

4. Points 1, 2, 3, and 5 of the syllabus in *Burt* v. *Timmons*, 29 W. Va. 441 (2 S. E. Rep. 780,) re-affirmed. (p. 213.)

*J. F. Brown* for appellant.

*W. J. W. Cowden* for appellees.

BRANNON, JUDGE:

On the 20th of November, 1874, the Kanawha Valley Bank

---

*On account of illness.

recovered a judgment in the Circuit Court of Kanawha county against Charles T. Duling, Herman L. Gebhart, and George W. Atkinson, for $861.92, and on the 31st of March, 1885, it brought a suit in equity in the Circuit Court of Ohio county against Ellen Atkinson and others, alleging in its bill the recovery of this judgment and its non-payment, and that on the 2d of January, 1882, the United States Building, Land & Loan Association of Wheeling conveyed to Ellen Atkinson a lot of land on Twelfth street in the city of Wheeling for the consideration of $3,300.00 and that said consideration was paid by George W. Atkinson, her husband out of his own funds; that he purchased it from the association, and that Ellen Atkinson paid no part of it, and that George W. Atkinson was largely indebted at the time and used the name of his wife and had the lot conveyed to her, to delay, hinder and defraud his creditors; that said Atkinson, on January 17, 1885, borrowed from the Commercial Bank $1,500.00 and secured it by a deed of trust on said lot executed by his wife and himself; and alleged that he was insolvent. The bill prayed that said lot be decreed to sale for said debt of plaintiff, and that the deed to Mrs. A. be held void as to said bank.

Ellen Atkinson answered admitting the debt of plaintiff, her husband's insolvency and the deed of trust to the Commercial Bank for money borrowed by her husband, but denying that the consideration of the conveyance to her of said lot was paid by her husband, or that he purchased, or that he used her name in the conveyance to defraud his creditors, or that she never paid any consideration deemed valuable for the lot. She averred, that she married on 8th December, 1868, and when she married she and her sister owned a lot in Charleston vested in a brother as trustee, and, she having bought her sister's share, it was conveyed to her 21st March, 1870; that on the 8th February, 1871, Bessie Eagan, her sister, purchased a lot in Charleston, and on 10th March, 1871, she, Ellen Atkinson, and Bessie Eagan traded properties, and said Ellen received in the exchange a property in Charleston called the "Moore Property;" that on 1st of November, 1872, she, her husband joining in the deed, conveyed to Smith and Gilligan a portion of said lot for $4,000.00

and on 15th August, 1874, conveyed the balance to A. C. Fellars for $500.00; that, with part of the money received from said two pieces of property she purchased from the Methodist Episcopal Church the parsonage-property in Charleston, paying for it $2,000.00 cash; this last-mentioned property on February 1, 1883, she and her husband conveyed to J. D. Pubbs for $1,500.00; that it was from these transactions with the money she received from the sales of her separate estate the purchase-money was paid to the said association for said lot in Wheeling. She denied all allegations of fraud.

George W. Atkinson answered admitting the indebtedness and his inability to pay his debts. He alleged, that it was not true, that the consideration for the Wheeling property was paid by him, or that he used the name of his wife in its purchase to defraud his creditors, and averred, that the consideration for the property was paid wholly with money belonging to his wife; that when he married her she owned real estate in Charleston, which was exchanged for other real estate, from the sale of which $4,750.00 was realized, and said Wheeling property paid for out of it. He admitted, that the deed of trust to the Commercial Bank was for a loan to him. Depositions were taken. On the hearing plaintiff's bill was dismissed, and it appealed here.

It is clear from the evidence of George W. Atkinson and Mrs. Atkinson, that the proceeds of the sale of her Moore property went into his hands and with her knowledge; that he gave her no note for it nor any memorandum touching it. She declined to receive a note for it, as he definitely states. No written account of moneys proceeding from her property, though there were several transactions, or of rents arising from it was kept by either of them. He made no deposit in bank or elsewhere to her credit, or to himself as her trustee or agent in any manner designating it as a special fund distinct from his own money. Other moneys he certainly had during the years covered by the transactions pertinent to this case, for he was holding lucrative offices under the United States government,—postmaster at Charleston, collector of internal revenue, and United States marshal,—and he had a bank account, as he speaks

of drawing checks on bank. Moreover it cannot be said, that the money arising from the sale of her property or its rents went to acquire the Wheeling property rather than any of his own proper money derived from other sources, for he mingled it with his and used it for years in his business. His own deposition shows this.

He said: "The $3,300.00 was paid by me as agent for my wife out of her funds, which I held in trust for her." When asked how long he had held in trust funds of his wife, he answered : "From the time it came to my hands from the sale of the Charleston property until it was paid over for the Wheeling property." Being asked as to the character of the trust, he answered : "It was a positive understanding between us that the money was hers; that it should not be taken from her but be forthcoming, when her needs required it. I offered to give her notes, but she declined to receive them, for the reason that she knew, that I would not defraud her out of it, and the further reason that neither of us considered it necessary, in a legal point of view, to pass notes between us." He further said : "It was a verbal contract. It was at various times, and, as I have stated above, no notes were given. The only evidence of the contract was the verbal acceptance of it. It was a verbal contract between man and wife, which should be held sacred, and I have ever regarded it such." Asked to state definitely the time, when he received $4,750.00 which he admitted having received from her property, he answered: "I can not. I have no means of arriving at the exact date." When asked to state, what he did with the money immediately on its receipt, he says: "I can not for the life of me answer that question." He stated also, that the money was received at different times, and he could not say definitely the disposition he made of the money at the time; and that $2,000.00 of it was paid on the Methodist Episcopal Church lot in Charleston, and some of it was on the purchase of the lot in Wheeling.

He was asked to state, outside of the $2,000.00 paid the Methodist Episcopal Church, what disposition was made of any part of the $4,750.00, where it was, or how it was used up to the time of the purchase of the Wheeling lot, and he replied: "I can not definitely furnish you the desired in-

formation. I held it in my possession and may have used
it temporarily in some of my business undertakings, but it
was always understood, that it should be forthcoming or its
equivalent, when needed by my wife." He further stated
that he held the money in trust and paid the same to her
creditors "out of my own resources," either growing out of
the funds I held for her, and may have used in my own af-
fairs, or out of my earnings in my business undertakings."
He was asked: "Can you not state more definitely the im-
mediate sources from which you got the money you paid for
the property on Twelfth street, in Wheeling?" He an-
swered: "I cannot." He further stated: "It may be that
I borrowed temporarily from A. F. Gibbons funds to help
make up a sufficient sum to pay one or more of the notes of
my wife due for the purchase-money of the property men-
tioned in the bill. I have stated over and over again that I
had received from my wife in trust for her, and as her agent,
a sum or sums of money greater than the amount paid by
her in the purchase of the property mentioned in the bill,
and that the money so received from her was held by me in
trust for her, and frequently used by me in my personal
transactions, but when the money was required by her it was
always forthcoming."

He was asked, "Was the money held by you in trust for
your wife so held or placed, that you could distinguish it
from your own money?" and answered, "It was not in the
general handling of it, but at all times I kept a careful ac-
count of the same, so that I could at any time answer the
question as to how much of her funds I had in my posses-
sion." When asked when and how the account was kept,
and where it was then, he answered: "The transactions in-
volved only real estate, and, when a piece of property was
sold, the amount of course was known to both. It was
therefore a very easy matter to keep track of the amounts
without keeping a written record. I do not remember
whether either of us ever made any entry of these transac-
tions in writing. There never was a time, however, when it
was not known to both of us the exact amount I held for
her." He then stated he owed her a balance of $350.00 ex-
clusive of interest.

He was then asked to state the receipts and disbursements, and replied: "I received $4,750.00 from the sale of the Capitol-Street property. I paid $2,000.00 for the Methodist Episcopal Church parsonage. This left a balance in my hands to her credit of $2,750.00. I received from the sale of the parsonage property $1,500.00. This would make $4,250.00 of her money which I held in trust. I paid for her on the property men-tioned in the bill $3,300.00. This would leave a balance due her of $950.00. Deducting from this the amount paid by her on the Mountain Lake property, $500.00, would leave a balance to her credit of $450.00. You will see from my last answer I made a clerical error of $100.00 when I said $350.00."

He was then asked if the above moneys constituted all that he held in trust for his wife, and he answered: "I presume it does not, although I can not now think of any sum." His wife stated that he collected rents. He further stated that his wife did not directly exercise direction or control as to any property held in trust for her, but always felt that her funds would be forthcoming "at her call, should I live, with-out any note or bond, and, if I should die, I carry enough life insurance to make her comfortable." When asked where he got the $500.00 cash payment on the Wheeling lot he answered: "I can not answer that question, as I do not remember." When asked where he got the money to pay the second $500.00 payment, he answered: "I can not answer that definitely, as I kept no separate accounts from whom I received funds due me from persons with whom I had busi-ness transactions." He made the same answer as to the third $500.00 payment. When asked by whom a further $500.00 payment was made, he answered: "My recollection is, I paid it as the agent of my wife." These quotations furnish, substantially, the case as put by the defendant G. W. Atkin-son. The defense rested on the evidence of G. W. Atkinson and wife.

It can not be said, that the specific money from her prop-erty was paid on the purchase of the Wheeling property. It came from his general funds. He denominates it a "trust." He may honestly so regard it, but to merely denominate it a "trust" does not make it a trust, unless the facts in law make it one. A trust must have a definite, certain subject-matter.

Hill, Trustees, 44. The trust will not be executed, unless the precise nature can be ascertained. It must have a specific, certain object, if express. 1 Perry, Trusts, § 83. Mrs. Atkinson says: " At my own request my husband took charge of my money to keep it for me. I knew he would be a much safer person to have care for it than I. I don't know anything about how it was used. He had it for me. He pledged himself, that, at any time I wanted it to invest in a home, it would be forthcoming. He pledged himself solemnly to that." But viewed in the most favorable light is this anything but a loan from her ? A deposit for sake-keeping until called for ? He was not charged with selecting and buying a home. No specific instruction of that kind was given him by her, nor any undertaking on his part to do so, even according to her evidence. He was not a trustee to invest the fund. But when the question was propounded to him, " What was the character of the trust, on which you held the money ?" his answer was : "It was a positive understanding between us, that the money was hers, that it should not be taken from her, and that it should be forthcoming when her needs required it." He specifies no particular trust of legal outline or certainty with a specific object in view, and he does not say with Mrs. A. that he pledged himself to have the money, when she should want a home. The most that can be said of it is that George W. Atkinson was a mere holder or loanee of this money.

And here it is proper to say, that the contention, that a trust existed, is not set up in either of the answers of George W. and Ellen Atkinson ; the position taken by way of defence in them being that the Wheeling property was paid for not by George W. Atkinson but by the proceeds of the sale of her separate estate, and neither answer alleges, that the money therefrom went into the husband's hands by way of trust for any purpose. This defence is first found in the depositions, but the depositions can not be read to support a trust not set up in the answer, for the rule of pleading is that the *allegata et probata* must both exist and correspond, and the *probata* can perform no function unless preceded by *allegata.* Matters not charged in the bill or averred in the answer can not be considered on the hearing. *Hunter's*

*Ex'rs* v. *Hunter*, 10 W. Va. 321. Could it be regarded a trust for the purchase with her particular fund of the Wheeling lot, the case would have more strength, especially as to limitation. Can we uphold it as a loan?

Wells, Mar. Wom. § 370, p. 371, on the authority of *Schaffner* v. *Reuter*, 37 Barb. 49, and *Savage* v. *O'Neil*, 44 N. Y. 298, says: "As to loans between them, it has been held that where a conveyance made by a husband to a wife is only a fair equivalent for money borrowed of her, and is free from actual fraud, although executed after the debt has been incurred by him, it is supported by the antecedent equitable obligation to pay it, and in legal effect relates back to the time of the loan; so as, of course, to cut out any intervening creditor of the husband. Being equitably bound to pay, he may do so voluntarily, either in money or other property; and, if a creditor undertakes to impeach it, the burden is on him to show *mala fides;* that is, where a loan or the indebtedness of the husband to the wife is *prima facie* established; for, where a wife claims a debt due her, she must, like any other person, show it in some way." And in *French* v. *Motley*, 63 Me. 326, it is held that other creditors of a husband can not complain if he prefers to discharge a debt to her rather than to them. So in *Bank* v. *Kimble*, 76 Ind. 195, this position is said to be well settled in that state by several cases. So in *Steadman* v. *Wilbur*, 7 R. I. 481.

To the general proposition, that, if a clearly valid subsisting debt in favor of a wife against the husband were fully proven, he might pay it directly or indirectly, if he preferred to do so, by paying another for conveying property to her in discharge of said indebtedness, I would accede. But it is to be noted, that under the rule above quoted from Wells, a loan, a distinctive loan, as distinguished from a gift, must be established. In the Rhode Island case, which is as liberal as any towards the wife in this matter, it is held: "The law will not from the mere delivery by her of her money to him or from the permitted receipt by him of her separate income, imply a promise by him to repay her, but will require more,—either an express promise or circumstances to prove, that in such matter they dealt with each other as debtor and creditor." The Chief Justice in delivering

the opinion in that case says: "She cannot, when her husband becomes insolvent, convert into debts, as against his creditors, former deliveries to him of her money or other property, or permitted receipts by him of the income or proceeds of sale of her separate estate, which at the time of such delivery or receipt were intended by her as gifts, to assist him in his business, or to pay their common expenses of living; and, considering the relation between them, the law would not, merely from such delivery or receipt, imply a promise on his part to repay or replace, as in cases not thus related, but would require more, either in express promise or circumstances, to prove that in these matters they had dealt with each other as debtor and creditor." It was so held also in *Edelen* v. *Edelen*, 11 Md. 415.

It would be exceedingly dangerous to the business world to have a loose principle in this matter, and would open a wide door for the defeat of honest creditors. A husband and wife embark on the voyage of life together, expecting to meet the waves together, devoting to the support of themselves and children and to his success their common efforts and their several means. She is always willing from affection for her husband and interest in his success to extend him the help of her means, his business interests being in a large sense her interests, never expecting any return of the means she commits to his hands; and if, after he has had those means employed in his business for years, mingled indiscriminately with his, it were permitted to her, when misfortune overtakes him, to raise up loans to the prejudice of his creditors and support them by his own and her evidence, after creditors had trusted him in total ignorance of such loans, and he were allowed to use his means in purchasing real estate in her name, a wide road would be opened for the promotion of wrong against honest creditors. Better that there should be individual cases of hardship, than that such dangers should stand in the way of the business world. If any one must suffer, better that even the helpless woman suffer than honest creditors, whose means or property were perhaps consumed in furnishing shelter, food and raiment to the wife and her children.

In this case the husband had had the proceeds of the sale

of the Moore property, except what was invested in the church lot, some of it eight, some nine, some ten years nearly before the purchase of the Wheeling lot, and his wife's right of action for it as a loan had become barred. In *Crawford* v. *Carper*, 4 W. Va. 56, where a party had given a note to his father-in-law for money and property advanced at different times, for which no notes were taken at the time of the advancement, and of which no account was kept, and judgment was confessed on the note, and such note and judgment were attacked by creditors for fraud and were overthrown, BROWN, President of the court, without passing on the question, whether it was a just debt or not, but waiving that as unnecessary, said: "These debts thus acknowledged, and for which the note was given and judgment confessed, were all barred by the statute of limitations. And while it was all very right, if they were just and real, that they should be paid as between the parties, yet still the important question remains whether, under the circumstances of the case, it could be done so as to intercept the other *bona fide* creditors, whose debts were not so barred. And I am free to say I think it could not, because it comes clearly within the first section of chapter 118, Code of 1860, and is just such a case as it was the intention of the statute to prohibit."

Here the husband mingled the wife's money with his own; no note was ever given by him to her; no account kept; and he used it in his business. He collected some rents from the realty, as his wife says, and no account is kept. This is all right—as between husband and wife, very natural; but it does not answer the rigid requirements of the law, when the wife after her husband's insolvency seeks to set up indebtedness in her favor. And again, the fact, that the wife in 1885 united in a deed of trust conveying the Wheeling property to secure the large sum of $1,500.00 purely a loan by the bank to her husband, tends to confirm the idea, that it was substantially his property.

A line of decisions in our State made up of many well-considered cases goes far in behalf of creditors against fraudulent conveyances; and there is perhaps no state in the Union, whose decisions go further to vindicate the rights of honest creditors over such conveyances, especially when be-

tween relatives, and more especially between husband and* wife.

In *Burt* v. *Timmons*, 29 W. Va. 441, (2 S. E. Rep. 780) it is held: "A transaction between father and child, husband and wife, brother and sister, or between others between whom there exists a natural and strong motive to provide for a dependent at the expense of honest creditors, if such transaction be impeached as fraudulent, may be shown to be fraudulent by less proof, and the party claiming the benefit of such transaction is held to a fuller and stricter proof of its justice and of the fairness of the transaction, after it is shown to be *prima facie* fraudulent, than would be required if the transaction was between strangers." And that "when a wife purchases land or other property the burden is on her to prove distinctly that she paid for the land or other property with funds not furnished by her husband. Evidence that she purchased amounts to nothing, unless it is accompanied with clear and full proof that she paid for it with funds furnished by some one other than her husband." And the court also held that "a transfer of property, either directly or indirectly, by an insolvent husband to his wife, is justly regarded with suspicion, and unless it clearly appears to have been entirely free from intent to withdraw the property from the husband's creditors, or the presumption of fraud be overcome by satisfactory affirmative proof, it will not be sustained."

*Herzog* v. *Weiler*, 24 W. Va. 199 ; *McMasters* v. *Edgar*, 22 W. Va. 673 ; and other cases of same general principle, might be cited. Particularly in *McGinnis* v. *Curry*, 13 W. Va. 29, where a transaction, by which the proceeds of the sale of the wife's land went into the husband's hands, was held to be a gift by her not a loan, there is a strong leaning towards the position, that, where a wife allows the proceeds of the sale of her separate estate to go into her husband's hands and so remain for years, especially when he uses and invests it in business, it is to be taken, that the parties did not deal as debtor and creditor, that they did not contemplate the creation of debt but a gift rather than a loan.

I may say, that I have struggled hard to sustain this conveyance, but under the facts of the case and the decisions re-

ferred to, considering their letter and spirit I find myself unable to do so.   Our decisions are rigid, it must be admitted, but on the whole are right and promotive of the highest good faith (*uberrima fides*) between·debtor and creditor, and should not be relaxed.

Reference is made by counsel for plaintiff to the fact, that Mrs. A.'s earnings went to pay her sister for her interest in the home property, which was exchanged by Mrs. A. for the Moore property, and that such earnings were the property of the husband, and that, as the Moore property entered into the purchase of the Wheeling lot, such earnings may be followed up.   Such earnings would be the husband's. *Bailey* v. *Gardner*, 31 W. Va. 94 (5 S. E. Rep. 636).   So the ready.money, which she owned at marriage, and the furniture, which she sold, which money, furniture and earnings went to acquire the sister's half in the home property, would be the husband's.   But on March 21, 1870, the home property was.conveyed to Mrs. A., and ·it does not appear, that the plaintiff's or any debt then existed against the husband, and he could lawfully allow such earnings, furniture and money to be invested for her use; he could give it to her. True, the fact may not be wholly irrelevant, to be considered with the other circumstances in determining whose property is the Wheeling lot, but its weight does not seem to be important.

The decree complained of is to be reversed with costs against Atkinson and wife, and the cause remanded to the Circuit Court of Ohio county with instructions to ascertain the amount of the debt of the Commercial Bank under its deed of trust,· which appears to have priority, and enter a decree subjecting the said lot on Twelfth street, Wheeling, to said Commercial Bank's debt and plaintiff's judgment in the bill mentioned, and for further proceedings.

REVERSED.   REMANDED.