## CHARLESTON.

MYNES *v.* MYNES *et al.*

Submitted January 13, 1900—Decided March 31, 1900.

1. MORTGAGE—*Payment—Presumption.*

On the 29th day of March, 1877, J. W. M. executed his three bonds or notes, of one thousand dollars each, to S., who on the 11th day of February, 1882, assigned and delivered same to M., the wife of J. W. M., who kept said notes and the deed of trust securing them in a trunk at the common home of J. W. M. and M., to which trunk M. kept the key until her death, in December, 1887. After the death of J. W. M., in July, 1894, the notes and deed of trust were found in the same trunk with some other papers of M., and some papers, also, of J. W. M., by his administrators, and by them delivered to the administrator of M. *Held,* that the possession of J. W. M. of said notes and trust deed, under the circumstances, does not raise the presumption of the payment or extinguishment of said notes. (pp. 690-691).

2. STATUTE OF LIMITATIONS.

After the statute of limitations has commenced to run, no subsequent disability will interrupt it. (p. 696).

Appeal from Circuit Court, Putnam County.

Suit by Phoebe Mynes against James M. Mynes and others. From the decree, Phoebe Mynes and Freda Mynes appeal.

*Affirmed.*

BROWN, JACKSON & KNIGHT, for appellants.

BOWYER & GREEN, for appellees.

MCWHORTER, PRESIDENT:

On the 29th of March, 1877, James W. Mynes executed a deed of trust on his home place, in Putnam County, containing about five hundred and eleven acres, and all the personal estate then in his possession, consisting of horses,

cattle, sheep, hogs, wagons, farming utensils, and grain, and everything on the said real estate, as set out in said deed of trust; conveying the same to John S. Smith in trust to secure to George H. Smith the payment of three bonds bearing the same date, for the sum of one thousand dollars each, payable to said George H. Smith or order, respectively, in one, two, and three years, with interest from date. It was provided that said Mynes should hold possession of all said property until the same should be required of him for sale in pursuance of said deed; that no sale of said property or of any part of it was to be made under the deed until after the expiration of said time of three years, without the consent of said Mynes first had thereto in writing. Margaret J. Mynes, the wife of James W. Mynes, died in December, 1887. In 1889 James married again. In 1894 he died, leaving his widow, Phoebe A. Mynes, and a daughter by the last marriage, Freda Mynes, about two years of age, and eight children by his first marriage. After his death his son James M. Mynes and his son-in-law W. P. McAboy were appointed his administrators, who found in an old leather trunk (which he had kept in his bed room for many years, and the key to which was delivered to the administrators by the widow, Phoebe A. Mynes), among the papers therein, the said deed of trust and the three one thousand dollars bonds secured therein, which bonds were on one piece of paper, and had the following indorsement thereon: "I assign the within notes to Margaret J. Mynes, with this deed of trust on record in Winfield, Putnam County, West Virginia, for value received of her the 11th of February, 1882. George H. Smith." After the finding of the deed of trust and notes or bonds, Oscar B. McAboy, a son-in-law of said James W. Mynes, was, at the instance of some of the children of Margaret J. and James W. Mynes, in the month of March, 1895, appointed administrator of the estate of Margaret J. Mynes, to whom the administrators of James W. Mynes delivered the deed of trust and notes, when the administrator of Margaret required the trustee, John S. Smith, to make sale of the property under the trust. He accordingly advertised the same to be sold on the 13th of April, 1895. Phoebe A. Mynes filed her bill in the circuit court

of Putnam County against the trustee, the administrators
of James W. Mynes, and the eight children of James.W.
and Margaret J. Mynes, George H. Smith, and Freda
Mynes, the infant, alleging that her husband died seised of
the said five hundred and eleven acres of land, in which she
was entitled to dower; that she was married to Mynes in
1889; that before their marriage, in 1877, he had executed
the said trust deed to John S. Smith, trustee, to secure an
apparent indebtedness of three thousand dollars, which
was due by the terms thereof many years before her hus-
band's death; that she was informed by him prior to his
death that there were no liens or debts against the said
home; that since his death George H. Smith had had the
trustee to advertise to sell the same; that, if said alleged
indebtedness ever had any legal validity, it was paid off and
discharged or extinguished during her husband's lifetime;
that Smith had made no effort to collect it from the admin-
istrators of said intestate, out of the large personal estate
which came to their hands, while the debts were very
small and inconsiderable; that said administrators and
children of decedent by his first marriage were, or some
one or more of them were, acting with said Smith in the at-
tempt to sell said land for a pretended and ficticious debt,
to defeat and destroy plaintiff's dower therein, and share
of her said infant daughter therein; that, if there is any
valid indebtedness secured by said trust deed, the personal
estate left by decedent was the primary fund out of which
payment should be made to exonerate the home place from
liability therefor, and that no sale should be made until an
accounting of the personal estate, and the same applied as
far as possible in the payment of such indebtedness, if any
such there be,—and prayed that George H. Smith be re-
quired to answer certain interrogatories set out, as to the
consideration moving from him to said Mynes for said al-
leged indebtedness; as to his efforts to collect it in Mynes'
lifetime, or from the administrators after his death;
whether any, and, if so, what, payments, credits, set-offs,
or counterclaims against the same; if so, the nature,
amount, and extent thereof, where and how made or ac-
crued; whether, in proceeding to enforce the trust, he was
acting at the instance or request, or upon the wish or ad-

vice, of said administrators, or either of them, or of any of the children of said Mynes by his first wife; if so, which of them, and the reason or purpose given by any of them; that said Smith be required to file with his answer the deed of trust, and any and all evidence he might have of the existence of said indebtedness, including the note purporting to evidence the same, and that said administrators be required to disclose and set forth all the personal estate of said decedent, and any and all debts against the estate; and for an order of injunction to the sale of the real estate under said trust deed, and, if it should appear that there was any valid indebtedness secured by said trust deed, that the personal estate should be first applied, before selling said real estate to the payment thereof; and for general relief. An injunction was awarded. George H. Smith answered the bill, admitting the execution of the notes and deed of trust by Mynes, dated March 29, 1877; that he was the brother-in-law of James W. Mynes, Margaret J. Mynes being his sister; that no legal consideration passed from him to Mynes for the alleged indebtedness secured by the trust deed; that said James W. Mynes, being desirous of giving, transferring, assigning, and securing to his then wife, said Margaret J. Mynes (respondent's sister) the sum of three thousand dollars out of his estate, and securing the same thereon, made and executed the bonds and deed of trust to respondent on the express understanding, promise, and agreement that respondent would transfer and assign the same to said Margaret, and that in fulfillment thereof he did on or about the 11th day of February, 1882, so transfer and assign them to Margaret J. Mynes by written agreement, and delivered them to her, and that he had no further interest in the matter; that said bonds were not intended to represent any indebtedness from said Mynes to him, further than the intended gift or settlement upon his said wife, and that at the time of making said bonds and deed of trust, in order to avoid any misunderstanding, complications, or wrong application of said bonds or the proceeds thereof in case of death or otherwise of any of the parties to said transaction, before the same was completed by his assignment, respondent made his three several bonds, each for the sum of one thousand dollars, payable to Margaret

J. Mynes or order, at one, two, and three years, respect-
ively, with interest from date, each bearing date March
29, 1877, and delivered the same to said Margaret J. Mynes;
that he did not owe the said Margaret the said three thous-
and dollars, or any sum whatever; that said last three bonds
were given her as indemnity or security until respondent
should transfer and assign to her the said three bonds of
James W. Mynes, and, at the time he assigned said last-
mentioned bonds to her, Mrs. Mynes returned to him the
bonds he gave her, and answered the interrogatories re-
quired to be answered. The eight children of James W.
Mynes and Margaret J. Mynes filed their joint and sepa-
rate answers, averring that the bonds and trust were ex-
ecuted by their father without any consideration from said
George H. Smith, but upon the express purpose, under-
standing, and agreement that the same should be a gift,
transfer, or settlement of the said sum of three thousand
dollars, with interest thereon, by the said James W. Mynes
to and upon his then wife, Margaret J. Mynes, the same to
be secured upon the property therein embraced, and that
at the time of the execution and delivery of said notes to
Smith, he expressly promised and agreed to transfer and
turn over the same to Margaret J. Mynes, to be held by
her as her individual property, and that in pursuance
thereof he did on or about the 11th of February, 1882, as-
sign, transfer, and deliver them to her, and that the same
remained in her possession till her death; that respondents
did not know of the assignment of the notes to their
mother until they were found in a package of papers about
the 1st of March, 1895, said package having been taken
from a trunk which was known as their mother's trunk in
her lifetime, and to which she carried the key, and which
was kept at the common home of herself and James W.
Mynes, and which remained at the said home after her
death, and soon after finding said notes they passed into
the hands of O. B. McAboy, as admisintrator of said Mar-
garet, who was requested by respondents, or some of them,
to have the trustee proceed to execute the trust; that said
bonds are valid, and constitute a good and subsisting claim
against the estate of said decedent, James W. Mynes, and
secured by said deed of trust, and which the representa-

tives of Margaret J. Mynes are entitled to have enforced and collected. Respondents deny that plaintiff, Phoebe A. Mynes, is entitled to dower in any portion of the real estate of which the said James W. Mynes died seised and possessed, because they say that in the lifetime of said James he purchased a house and lot in the town of Hurricane, in Putnam County, from H. M. Beckett, about the fall of 1889, · and soon after his marriage with said plaintiff, and at his instance and request, said Beckett conveyed the said house and lot directly to the said plaintiff; that said house and lot were intended to be in lieu of dower of said Phoebe, and of all her interest in the estate of James W. Mynes, and the house and lot were accepted by her in lieu of dower and her interest in said estate; that it was a fair and liberal provision for her after the payment of claims against the estate.

At the July rules, 1895, plaintiff filed her amended and supplemental bill against all the parties named in the original bill, and making Oscar B. McAboy, administrator of Margaret J. Mynes, a party to the bill, alleging the finding of the bonds and trust deed in the old leather trunk kept in his bedroom by said James W. Mynes, in which he kept certain of his papers and effects, including a considerable sum of money; that a short time before his death he directed plaintiff to take from his pants his pocketbook, in which she would find the key of said trunk, which she did, and found the key in the pocketbook, which key she kept until after his death, when she delivered the key to one of the administrators; that since filing her original bill she had learned, and now alleges the fact to be, that in her said husband's leather trunk were found the said bonds and trust deed representing the said alleged indebtedness, and therefore avers and charges that said alleged indebtedness had been fully paid off and extinguished by her said husband in his lifetime; that said administrators of her husband, or one of them, illegally and wrongfully either delivered said bonds or notes to the said administrator of Margaret Mynes, or illegally and wrongfully permitted said last-named administrator to take possession thereof, which plaintiff charges was done fraudulently, and for the purpose of defrauding her and her infant child of their several

interests in said real estate,—and praying: That the defendants be required to answer under oath the amended and supplemental bill, and that the administrators of James W. Mynes and the administrator of Margaret J. Mynes be in like manner required to answer under oath, and to the best and utmost of their several and respective knowledge, remembrance, information, and belief, answer and set forth: "(1) Whether it is not true that your oratrix delivered the key of said leather trunk to the said administrators of her said husband or one of them. (2) Whether it is not true that papers and effects of her said husband were found in said leather trunk after his death, and, if so, what papers and effects. (3) Whether it is not true that said trust deed from her husband to John S. Smith, trustee, was found after her husband's death in said leather trunk. (4) Whether it is not true that the bonds or notes mentioned in said deed of trust, and representing said alleged indebtedness, were not found after her husband's death in said leather trunk, and, if not found therein, where they were found. (5) Whether it is not true that her husband's administrators, or one of them, delivered said bonds or notes to the said administrator of Margaret J. Mynes, or permitted said last-named administrator to take possession thereof. (6) When, where, and how, and from whom, the said administrator of Margaret J. Mynes got possession of said bonds or notes. (7) Whether any changes, additions, alterations or erasures have been made in said bonds or notes since the death of James W. Mynes; if so, to what extent, in what manner, when and by whom made." That the administrator of Margaret J. Mynes be compelled to file with his answer the bonds or notes, and to state whether at the time of filing the same they are in the same plight and condition as they were at the time of the death of James W. Mynes, and whether there have been any changes, additions, alterations, or erasures in them, or any of them. And for the relief prayed for in the original bill, and that the trust deed and indebtedness and said bonds or notes be decreed fully paid and satisfied, and for general relief.

Oscar B. McAboy, administrator of Margaret J. Mynes, filed his answer, and says, that among the assets of his de-

cedeut, which came to his hands, were the three bonds or
notes described, made by James W. Mynes to George H.
Smith, and delivered to Smith on the 29th of March 1877,
and afterwards, on the 11th day of February, 1882, said
Smith by written assignment, indorsed on said bonds,
transferred the same to Margaret J. Mynes, and filed the
same with his answer; refers to the answer of George H.
Smith to the original bill as containing what he believes to
be a true account of said transaction; denies that said
bonds, or either or any part thereof, were ever paid to him
as administrator, or to any one else, but avers that they are
still due and wholly unpaid, and are assets in his hands as
such administrator, and a valid claim against the estate of
James W. Mynes, and a lien on the land and property con-
veyed in said deed of trust, and that he requested the trus-
tee to advertise and sell under the trust; that respondent's
first wife was a daughter of James W. and Margaret J.
Mynes; that he was frequently at their home, and that it
was true there was a trunk of the description spoken of in
these proceedings at their common home, to which Marga-
ret kept the key in her possession during her lifetime, and
he believes it remained in the possession of James W. Mynes
thereafter up to the time of his death; that it was turned
over to his administrators by plaintiff; that respondent
was one of the appraisers of the estate of James W. Mynes,
and that, when the trunk was opened at the time of the ap-
praisement, they found in said trunk individual papers of
Margaret J. Mynes among other papers therein, but little
examination ot her papers was made, and the bonds in
question were not discovered at that time. Respondent
denies any illegal or fraudulent intent on his part in get-
ting possession of the bonds, or that the same was done
fraudulently or for the purpose of defrauding plaintiff or
her child, or is seeking to collect the same with any such
purpose or intent, but simply to discharge his duty in that
behalf,—of administrator. In response to the interroga-
tories: It is true that plaintiff delivered the key to James
M. Mynes, one of the administrators; that the papers of
James W. Mynes were found in the trunk after his death;
that all of the papers produced to the appraisers, as far as
he knows, came from the trunk. Remembers among them

some tax tickets and other receipts, and also the notes, etc., placed on the appraisement bill. There were also in said trunk some individual papers of Margaret J. Mynes, an organ receipt, an organ contract, and some tax tickets, but did not examine her papers. The only other effects of said James W. Mynes taken from said trunk was a pair of pants, which respondent was informed, believes, and alleges were his first wedding pants. That the trust deed was found in said trunk after the death of said Mynes; also, the bonds. That it is true W. P. McAboy, one of the administrators, delivered the bonds to respondent after he requested it. That he knows nothing of the bonds, of his own knowledge, until about the time they came to his hands as administrator, and they have ever since been in his possession. That no changes or alterations have been made in them, or either of them, since they came to his possession, and that said bonds and assignment are in the same plight and condition as when delivered to him, and, he believes, in the same condition as when found, and at the death of said Mynes. Avers that the personal property mentioned in the deed of trust has been so scattered that the same cannot now be ascertained and identified in order to subject the same to the payment of said debt, and the personal property left by Mynes is wholly insufficient to pay off and discharge the bonds, but alleges that, in addition to the real estate mentioned in the trust deed, Mynes died seised of valuable real estate in the city of Huntington; and prays for dissolution of the injunction and sale of the property, and, if the proceeds should not be sufficient to pay the bonds, that the residue may be paid out of the residue of said estate of James W. Mynes, both personal and real.

Freda Mynes, the infant defendant, answered by guardian *ad litem*, and joined her mother in her prayer for relief.

Appellants contend that the main question involved in the case is: "Are the three bonds of March 29, 1877, executed by James W. Mynes to his brother-in-law George H. Smith, to be deemed surrendered and satisfied?" And that the solution of the question depends on whether the theory of the plaintiff, that the bonds secured by the trust

deed were intended to protect the property of Mynes against some threatened liability, or that of defendants, that it was intended by Mynes to make a settlement of the amount of the bonds and their interest on Margaret J. Mynes, his wife, is true; contending that, if plaintiff's theory is correct, the exchange by Smith of these bonds to Mrs. Mynes for the bonds Smith had executed to her, bearing the same date, on the 11th of February, 1882, five years after the execution of said bonds, was an extinguishment of both sets of bonds. It appears that no consideration passed from Smith to Mynes for the bonds, but that the bonds were executed for the benefit of Mrs. Mynes, and Smith executed the bonds to Mrs. Mynes, to be held by her until Smith should transfer and assign the Mynes bonds to her, which, it seems, he agreed and promised to do. It is hard to conceive why he did not assign the bonds at once, as he did five years afterwards, instead of executing and having outstanding all that time his own bonds; and he makes no explanation. It was no more trouble to write the assignment than the notes, but is it material which theory is correct? In either case it is a voluntary transaction, which would not be good as against then existing creditors, but good between the parties. *Billingsley* v. *Menear*, 44 W. Va. 651, (30 S. E. 61); *Harris* v. *Harris' Ex'r*, 23 Grat. 737. What object there would be in making the property over to his wife, we cannot well see, unless he was intending to provide against his own future acts in becoming involved in debt. Surely the reason given by Smith was a lame one,—"that Mynes might die, and his wife marry some fellow and squander the property;" for, if he had died without making the bonds and trust, the property would have gone to the heirs, subject only to the marital rights of the widow, and the "fellow" she might marry could squander nothing but her interest, while the bonds and trust would put it all in such fellow's power, she consenting. Appellants say that it is conceded that at least from the death of his first wife, in December, 1887, until his own death, in July, 1894, a period of nearly seven years, Mynes had possession of the trust deed and bonds, and that such possession was *prima facie* evidence that the bonds were extinguished, and cites several au-

thorities to that effect. In *Tedens* v. *Schumers*, 112 Ill.
263, it is held: "The fact that a due-bill is found in the
hands of the maker is *prima facie* evidence of its payment;
and the payee, suing on the same, is required to overcome
the presumption by a preponderance of evidence before he
can recover." *Lipscomb* v. *DeLemos*, 68 Ala. 592; *Chandler*
v. *Davis*, 47 N. H. 462; *Hays* v. *Samuels*, 55 Tex. 560.
This is good as an abstract proposition of law, but is the
possession of James W. Mynes such as to raise a presump-
tion of payment? Would not the circumstances of his pos-
session themselves overcome the presumption? These
notes at the date of assignment were delivered to Margaret
J. Mynes by the payee, George H. Smith. They were
found in the trunk in which Margaret kept her papers,
and to which trunk she kept the key up to the time of her
death. It was only the death of Margaret J. Mynes that
gave him the possession of the notes. He did not, prior to
that event, have exclusive possession and control of them.
They were in her trunk at their common home, and after
her death there was no one to make demand for or inquiry
about the bonds until a personal representative should be
appointed of her estate. I do not think James W. Mynes'
possession of the bonds at the time of his death was such
as to raise the presumption of their payment or extinguish-
ment. Appellants say the exchange of the bonds at the
time of the assignment, February 11, 1882, was an extin-
guishment of both sets of bonds. There is no question but
that it extinguished those made by Smith to Mrs. Mynes,
but surely not those assigned by Smith to Mrs. Mynes,
which were at that time delivered to her, and transferred
by the payee by written assignment; and this assignment
and delivery of the bonds of Margaret J. Mynes, took place
in the presence of the grantor, James W. Mynes, and, it
seems, with his assent, which is a very strong indication
that he intended the bonds for her benefit. In their peti-
tion for appeal, appellants give eight reasons for the theory
that the transaction was not intended as a marriage settle-
ment upon the first wife of James W. Mynes, the seventh
of which is that (the payee in the bonds, and who assigned
them to Mrs. Mynes) "Smith permitted his own son to buy
a part of the farm covered by the trust deed, and to build

upon and improve it, and never said a word about the trust deed." Appellees, in their brief in reply to said several reasons, in reply to the seventh say: "Smith does not seem to have known anything special about the purchase of a part of the land by his son. But, if he had, as the land had been first sold to James Mynes, a son of Mr. and Mrs. Mynes, and then sold by him to Geo. S. Smith, a nephew of Mr. and Mrs. Mynes and first cousin of James, he might well suppose that with such near relatives, and all in the family, he would be well protected in his purchase." Unless Mr. Smith has something outside of this record to rely upon, I am unable to see what encouragement he can have that his purchase will be well protected on account of near relationship, when he is in the hands of the same parties who are. doing all they can to defeat their stepmother and their baby sister in recovering what they are morally entitled to. Some people will not permit blood or relationship to stand between them and any legal rights. It is not probable that the residue of the real estate will come near paying the decree, so that the land purchased by George S. Smith will be liable for any balance remaining on the decree. . The evidence of George H. Smith, which is the only direct evidence as to the object of James Mynes in making and securing the bonds, is very positive, while the reasons therefor are not the soundest or best. The evidence introduced by plaintiff tending to show that Mynes claimed to have taken up or extinguished said bonds is vague and uncertain. On the evidence the circuit court found the facts in favor of defendants, and there is certainly no such preponderance in favor of the plaintiff as would authorize the appellate court to reverse the judgment on the facts, whatever its desire might be, excited by its view of the moral aspect of the case. *Smith* v *Yoke*, 27 W. Va. 639; *Bartlett* v. *Cleavenger*, 35 W. Va. 720, (14 S. E. 273); *Richardson* v. *Ralphsnyder*, 40 W. Va. 15, (20 S. E. 854); and subsequent cases. Yet the evidence on behalf of the plaintiff in the case at bar is hardly sufficient to bring it within the purview of the cases cited. I do not see how the circuit court could have held otherwise than it did.

Appellees assign a cross error,—that the court improperly held that the statute of limitations barred the said

notes, and each of them, and that the same, or any part
thereof, are not entitled to be paid out of the personal es-
tate of the said James W. Mynes, nor out of any of the
other real estate belonging to him, except that conveyed
in the deed of trust to secure the said notes,—and cite
*Righter* v. *Riley*, 42 W. Va. 633, (26 S. E. 357), in support
of the proposition. The appellants make no mention of
this in their brief, and I do not remember that it was re-
ferred to by either party on oral argument. It is held in
*Righter* v. *Riley*, that "the claim of a wife against the hus-
band is not barred by the statute of limitations during cov-
erture, if at all, until twenty years from the original incep-
tion or written renewal thereof." This is based on the
fact that because of "coverture, and their recognized sub-
jection to the control of their husbands, they are especially
exempted from the operation of the statute," as stated in
the opinion in said case, which flows from the old common-
law doctrine that the wife could not sue the husband at
law. Code 1868, chapter 104, section 3, provides that "if,
at the time at which the right of any person to make entry
on, or bring an action to recover, any land, shall have first
accrued, such person was an infant, married woman, or in-
sane, then such person, or the person claiming through him
may, notwithstanding the said period of ten years shall
have expired (except in the case of a married woman when
such land is her sole and separate property), make an entry
on or bring an action to recover such land within five years
next after the time at which the person to whom such right
shall have first accrued as aforesaid shall have ceased to be
under such disability as existed when the same so accrued,
or shall have died, whichever shall first have happened."
This is taken from Code Va. 1860, chapter 149, section 3,
without change except as to time of limitation, and that con-
tained in parentheses, excepting therefrom the case of a
married woman when such land is her sole and separate
property. Section 16 of said chapter 104, relating to the lim-
itation of personal actions, is section 15 of said chapter 149,
Code 1860, re-enacted, with the like parenthetical change,
"except in the case of a married woman, as provided in
section three of this chapter;" that is, in personal actions
relating to her sole and separate property. The same

Code (section 12, chapter 66) provides that: "A married woman may sue and be sued without joining her husband in the following cases: (1) When the action concerns her separate property. (2) When the action is between herself and husband. (3) When she is living separate and apart from her husband. And in no case need she prosecute or defend by guardian or next friend." The word "action" has a legal signification, and does not apply to a suit or proceeding in equity. The legislature clearly intended to give her the right to sue her husband or any one else in a case in which her separate estate is concerned. What would be the sense in providing that she should sue and be sued without joining her husband, "when the action is between herself and husband," when he can neither sue her, nor can she sue him, and consequently no action can exist between them? It is not only clearly provided that she may have her action against him, but it is as clearly provided in section 16, chapter 104, Code 1891, that, in case the subject-matter of the action is her sole and separate property, her coveture is not a disability, and does not prevent the statute from running. In *Miller* v. *Cox*, 38 W. Va. 747, (18 S. E. 960), it is clearly indicated in the syllabus that the statute of limitations runs against the wife during coverture. That was a case in which, during the pendency of an action against a husband for the purpose of obtaining a judgment on a note made by him, he executed a deed of trust on his real estate to a trustee to secure the debtor's wife the payment of a sum of money which he claimed she had loaned to him, which he had used in his business, and which, as stated in the first point of the syllabus, was barred by the statute of limitations when the deed of trust was executed; and the fifth point of the syllabus holds: "If at the date of said trust deed the claim thereby sought to be secured is barred by the statute of limitations, that fact has a strong tendency to defeat said trust deed as a lien in favor of the wife against *bona fide* creditors of the husband." Also, in *Bank* v. *Atkinson*, 32 W. Va. 203, (9 S. E. 175), (Syl., point 2): "If, when such purchase is made, any claim which she may have on him for such proceeds of her real estate is barred by limitation, that circumstance tends strongly to repel the wife's

claim to exempt the land against creditors." In *Bennett
v. Bennett*, 37 W. Va. 396, (16 S. E. 638), this question is
pretty fully discussed and good reasons given why the wife
should be permitted to sue, among other things, for the
protection of her own rights against other creditors, who
may obtain judgment liens and absorb the husband's es-
tate, leaving her without relief. Judge Brannon, in writ-
ing the opinion of the Court in the case, says, "The ten-
dency of decisions seems to be that way," and says: "In
*Alexander* v. *Alexander*, 85 Va. 353, (7 S. E. 335), 1 L. R.
A. 125, the opinion supports the right to sue the husband
at law, because of the married woman's act. But the com-
mon law prevails with us, and under it a wife cannot con-
tract with her husband; and chapter 66, Code, giving her
the right to hold separate property, has not given her ca-
pacity to contract at law, or to contract with her husband."
In *Scott* v. *Scott*, 13 Ind. 225, it is held that the wife may
sue her husband, in respect of her separate estate, under
their statute, which is almost identical with ours, and pro-
vides: "When a married woman is a party her husband
must be joined with her; except: First, when the action
concerns her separate property, she may sue alone; sec-
ond, when the action is between herself and husband, she
may sue or be sued alone." The court say: "This sec-
tion seems to fully warrant the suit," and further say,
"After the passage of the Code, the legislature provided
in effect, that her personal property should be her sepa-
rate property, and it follows that she may sue her husband
or any one else in respect to it." And in *Wright* v. *Wright*,
54 N. Y. 437, it is held that: "A note given in considera-
tion of a promise to marry is valid in the hands of the wife
after marriage, and an action may be maintained thereon
by her against her husband. It is immaterial whether the
form of the action by the wife against her husband upon
such a note be at law or in equity, if facts are stated en-
titling the plaintiff to the relief demanded. It is the duty
of the court to afford the relief, without regard to the name
to be given to the action. It seems that, under the present
policy of this State in respect to the relations of husband
and wife, the latter can sue the former to enforce any
right affecting her separate property in any form of ac-

tion, the same as if he were a stranger." *Wilson* v. *Wilson*, 36 Cal. 447. How can the common law prevail with us, when we have a statute in contravention of it? It is the duty of the courts to give full force to statutes when it clearly appears therefrom that such statutes were intended by the legislature to contravene the common law. But, however this may be, these bonds were made payable to and held by George H. Smith, dated March 29, 1877, and assigned by him to Margaret J. Mynes on the 11th day of February, 1882. The statute began to run several years before the bonds were assigned by Smith to Mrs. Mynes. "As a general rule, when the statute of limitations is once in motion, nothing can interrupt it." 13 Am. & Eng. Enc. Law 731. In *DeKay* v. *Darrah's Adm'rs*, 14 N. J. Law, 288, 294, it is said, "The course of decisions, both in England and in this country, has established the rule, beyond doubt, that, when the statute has commenced running, it runs over all subsequent disabilities and intermediate acts and events." And in *McDonald* v. *Hovey*, 110 U. S. 619, 4 Sup. Ct. 142, 28 L. Ed. 269, Justice Bradley says, in speaking of the statute of limitations, "And after it has commenced to run, no subsequent disability will interrupt it." In *Doe* v. *Jones*, 4 Term R. 300, Lord Kenyon says, "I confess, I never heard it doubted, until the discussion of this case, whether, when any of the statutes of limitations had begun to run, a subsequent disability would stop their running." See authorities cited in note 3, p. 732, 13 Am. & Eng. Enc. Law; *Jones* v. *Lemon*, 26 W. Va. 629; *Parsons* v. *McCracken*, 9 Leigh 495; *Caperton* v. *Gregory*, 11 Grat. 505; 1 Rob. Prac. (N. S.) 609; 1 Bart. Ch. Prac. § 34; Ang. Lim. §§194, 197; *Sherman* v. *Stage Co.*, 24 Iowa. 515. The statute of limitations having commenced to run, and having been running some years on the bonds in the hands of George H. Smith before they were assigned to Mrs. Mynes, under these authorities, and others therein referred to, if Mrs. Mynes was under the disability claimed, such disability would not interrupt the running of the statute. For the reasons herein stated, the decree must be affirmed.

Dent, Judge:

I concur in the conclusion in this case, but not with that portion of Judge McWhorter's opinion which tends to abrogate the common law disability of husband and wife to enter into valid legal contracts with each other during coverture. He unwittingly falls into the same error inadvertently committed by Judge Brannon, in the case of *Bank* v. *Atkinson*, 32 W. Va. 203, (9 S. E. 175), and followed by Judge English, in *Miller* v. *Cox*, 38 W. Va. 747, (18 S. E. 960). This arises from a misconstruction of the statute authorizing a married woman to sue and be sued without joining her husband, which was made a part of the code law of this State as early as 1868. In 1877 this Court, in the case of *Stockton*, v. *Farley*, 10 W. Va. 171, this provision being involved (Judge Green, delivering the opinion), held, "In this state a common law suit cannot be brought against a married woman on any contract made by her while married and living with her husband." And in 1886, the same statute being under consideration, this Court held (Judge Snyder, delivering the opinion) that "a note given by a husband directly to his wife during coverture is void, and no action at law can be maintained upon it against the husband." *Roseberry* v. *Roseberry*, 27 W. Va. 759. In commenting on the statute, Judge Snyder says, on page 760: "A careful examination of this chapter will fail to show any change in the common law respecting the right or power of a wife to contract with her husband. This statute deprives the husband of his marital rights in the property of his wife, and confers upon her a legal separate estate in her property. It also gives her the right to acquire property, in certain cases, from persons other than her husband, and to sue and be sued without joining her husband in specified cases, but it nowhere and in no manner authorizes or enables her to contract with her husband in any case." And in the case of *Carey* v. *Burress*, 20 W. Va. 571, it was held (Judge Green, delivering the opinion) that "a married woman cannot be sued in a court of law in this State on any contract made while living with her husband," for the reason (given) that a married woman has no capacity, while living with her husband, to enter into any contract. See, also, *Peck* v.

*Marling's Adm'r*, 22 W. Va. 708. In *White* v. *Manufacturing Co.*, 29 W. Va. 385, (1 S. E. 572), it was held that a judgment against a married woman, rendered upon a contract made during coverture, was an absolute nullity, because of her incapacity to contract. In *Picken's Ex'rs* v. *Kniscley*, 36 W. Va. 794, (15 S. E. 997), the incapacity of a married woman living with her husband to make valid contracts, suable at law, either by or against her, is strictly adhered to, as held in the foregoing cases (JUDGE BRANNON delivering the opinion). In the case of *Bennett* v. *Bennett*, 37 W. Va. 396, (16 S. E. 638), (the same judge delivering the opinion), it is again reiterated that a married woman "cannot sue her husband at law, because she cannot contract with him at law." *Bank* v. *Atkinson*, and *Miller* v. *Cox*, were both causes having their inception before the changes made in the married woman's statute in 1891, and thus were decided as the law stood under the foregoing decisions. In harmony with the inability of a married woman to make valid contracts during coverture are the cases of *Rogers* v. *Lynch*, 44 W. Va. 94, (29 S. E. 507), (opinion by JUDGE ENGLISH); *Stewart* v. *Assurance Co.*, 45 W. Va. 734. (32 S. E. 218), (opinion by JUDGE McWHORTER,); and *Schamp* v. *Association*, 44 W. Va. 47, (28 S. E. 709), 44 L. R. A. 101, (opinion by JUDGE BRANNON). The last case arose under the code of 1891. Under this statute a married woman was permitted to acquire property from even her husband, but she could only charge it in a certain manner, and she could only be sued as to such charges in chancery, for she was not personally bound for them. The amendment of 1893 again took away her right of acquiring property from her husband. Acts 1893, chapter 3. In this respect the law was restored as it existed in 1868, and there is no provision therein contained abrogating the common-law disability of husbsnd and wife living together to enter into contracts with each other, enforceable in a court of law. Section 3 expressly preserves this disability by providing that she can acquire property "from any person other than her husband." While section 15 provides that she "may sue or be sued in any court of law or chancery in this State, which may have jurisdiction of the subject-matter, the same in all cases as if she were a *feme sole*,"

it does not remove her common-law disability, while living with her husband, to contract with him. If such were the case the provision in section 3, before referred to, would be nullified, and section 14, providing that "a married woman living separate and apart from her husband may in her own name carry on any trade or business," becomes unnecessary. Section 12 secures her earnings as her separate property, but this does not authorize her to charge him wages for services, nor him to charge her for her board and clothes. If the common-law relation of marriage is wholly nullified by the statute, so as to allow husband and wife to contract with each other as though single, then the law would imply contracts between them as for services rendered, moneys expended, etc., and the marriage relation would become one of dollars and cents, instead of a matter of mutual love and affection, for which there could be no such thing as a money compensation. It is undoubtedly true that the mercenary spirit of the times is tending in this direction, as man becomes more and more the slave, and Mammon more and more the master; but such an unfortunate climax has not yet been reached, but in the homes of this State mutual affection is still the sacred tie that binds husband and wife together, and the law still recognizes such to be the true nature of their relationship to one another, and leaves their mutual dealings to be heard and determined by a court of chancery, with power to dissolve the marriage relation. The contracts between husband and wife during coverture, while living together, thus being cognizable only in equity, having jurisdiction of the subject-matter, the statute of limitations can have no application to them. This was the conclusion reached by the Court in the case of *Righter* v. *Riley*, 42 W. Va. 633, (26 S. E. 357). For admitting that a wife may sue her husband at law as to her separate property, and that the statute of limitations bars such suits, yet, as she cannot acquire property from him, nor contract with him, a suit at law as to such property or contract would not be concerning her separate property, and he could plead coverture in bar thereof. Hence it would not come under the exception as to suits regarding her separate property, and her disability consequently would prevent the running of the stat-

ute, at least for twenty years. But the better conclusion is that a married woman's right to property acquired of her husband during coverture is purely equitable, and not legal, and no action accrues to her, therefore, during her disability.

*Affirmed.*